## 24402

The STATE Respondent v. Angela COPELAND, Appellant.

(468 S.E. (2d) 620)

Supreme Court

*Lisa T. Gregory* and *Tara Dawn Shurling, Assistant Appellate Defenders, South Carolina Office of Appellate Defense,* Columbia, *for Appellant.*

*Attorney General T. Travis Medlock, Chief Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General Harold M. Coombs, Assistant Attorney General*

*Alexandria B. Skinner,* Columbia; and *Solicitor Wade S. Kolb, Jr.,* Sumter, *for Respondent.*

Heard Jan. 10, 1996.

Filed Mar. 25, 1996.

BURNETT, Justice:

Angela Copeland appeals her convictions and sentences for murder (life imprisonment), armed robbery (ten years consecutive imprisonment), and possession of a weapon during a violent crime (five years concurrent imprisonment). We affirm.

## FACTS

At approximately 8:30 pm on March 22, 1991, police officers found the body of Floyd Davis (Victim) lying along a roadside in Sumter County. The deceased Victim had been shot in the heart at close range. Although twelve dollars in change was found on the Victim, wallets normally carried by the Victim were not found at the crime scene.

At trial, the Victim's employer testified that the Victim had received a paycheck between 4:00 and 5:00 pm on March 22nd. As was his custom, the Victim took his payroll check to a retail liquor store to be cashed. The owner of the liquor store testified that on March 22nd he cashed the payroll check as well as a tax refund check for the Victim—both checks totalling in excess of one thousand dollars.

The Victim's girlfriend testified that he normally carried two wallets—a green cloth wallet which contained his spending money and a leather wallet which contained the bulk of his money. She further stated that the Victim was at a beer garden adjacent to the liquor store at approximately 5:00 pm on March 22nd. The girlfriend testified that she saw him take money from the green wallet to pay for beer. Another friend testified that he drove the Victim home from the beer garden that night between 6:00 and 6:15 pm.

A neighbor testified that he saw the Victim in his yard between 7:30 and 8:00 pm on March 22nd. He further stated that when a small car drove up, the Victim approached it and talked to the driver. The car left shortly thereafter. The neighbor identified Copeland's car as the vehicle he saw on March 22nd in the Victim's yard.

The following was revealed during an *in camera* hearing. After Copeland, a resident of Tennessee, became a suspect in this matter, police officers from South Carolina met with her in Tennessee. Copeland initially told them that she had been in Tennessee at the time the murder was committed. Police officers then interviewed Copeland's husband, and as a result of his statements, the officers located and identified the vehicle seen by the neighbor in the Victim's yard on March 22nd. The identified vehicle belonged to Copeland.

The trial court ruled that the spousal privilege prevented admission of the actual content of the statements of Copeland's husband. However, the trial court held that references could be made to the fact that discussions with Copeland's husband subsequently led the police to discover the vehicle seen in the Victim's yard on March 22nd. This discovery provided the police with probable cause to suspect Copeland. As a result, on April 24, 1991, Copeland was arrested and read her *Miranda* rights. She then voluntarily stated that she had been in Sumter on March 22nd and that someone named "John" committed the murder.

Copeland returned to Sumter, South Carolina, and was incarcerated with Tonya McBride. At trial, McBride testified that Copeland admitted that she and "John Carter" planned to rob the Victim for his income tax check. The plan was for Carter to pose as a drug dealer, for the three of them to get crack cocaine together, and then for Carter to pull a gun on the Victim. However, when Carter pulled the gun, the Victim would not give up his money. McBride further testified that Copeland told her that when Carter did not shoot the Victim after she told him to do so, she did it herself and then drove to Tennessee.

Copeland negotiated an agreement with police whereby she would give a statement in exchange for leniency. Based upon this understanding, Copeland gave a statement on May 22, 1991, naming "John Carter" as the trigger man in the murder. When Carter was not immediately located, Copeland's brother, in exchange for dropping a gun charge and armed robbery charges pending against him, assisted the police in finding Carter.

The trial court ruled Copeland's May 22nd statement inadmissible because it had been induced by promises of leniency

which were not delivered, thus making it involuntary. Nevertheless, the trial court refused to rule that the discovery of Carter depended entirely upon the illegally obtained statement. The judge based this ruling upon the fact that while Copeland was in Tennessee, she voluntarily revealed the existence of an individual named "John" to the authorities.

Prior to trial, Carter pled guilty to armed robbery and possession of a firearm while committing a violent offense. At trial, Carter admitted that he agreed to participate in Copeland's plan to pose as a drug dealer and to pretend to hold up the Victim and Copeland. He further testified that Copeland gave him a gun, but she told him that it was not loaded. In addition, Carter conceded that he pointed the gun at the Victim and demanded money from him. However, Carter asserted that when Copeland came from behind him and grabbed the gun, it went off and he dropped it. Upon realizing that his fingerprints were on the gun, he picked it up and ran.

Copeland testified that Carter and the Victim were riding with her in her vehicle on March 22nd. Carter was in the back seat and the Victim was in the front passenger seat. Copeland asserted that as Carter got out of the back seat, she heard a boom and saw the Victim fall from the car. She panicked and pulled away leaving the Victim behind.

Counsel for Copeland moved for a directed verdict on the armed robbery charge. The trial court denied the motion after concluding that there was sufficient circumstantial evidence to warrant submitting three charges to the jury.

## ISSUES

Did the trial court err in:

I. Admitting John Carter's testimony?

II. Admitting police testimony concerning conversations with Copeland's husband.

III. Denying Copeland's motion for a mistrial following the State's closing argument?

IV. Denying Copeland's motion for a directed verdict?

## DISCUSSION

### I. *Admission of John Carter's Testimony*

On April 24, 1991, after Copeland was arrested in Tennessee, she voluntarily told police that a person named "John" murdered the Victim. Copeland contends that this statement did not reveal John's last name and, therefore, John Carter was discovered only through a statement made by her on may 22, 1991. Because the May 22nd statement was illegally obtained and inadmissible, Copeland contends that the trial court erred in not applying the "fruit of the poisonous tree" doctrine to preclude Carter's testimony. We disagree.

The "fruit of the poisonous tree" doctrine provides that evidence must be excluded if it would not have come to light but for the illegal actions of the police, and the evidence has been obtained by the exploitation of that illegality. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. (2d) 441 (1963). However, the challenged evidence is admissible if it was obtained from a lawful source independent of the illegal conduct. *State v. Cox,* 287 S.C. 260, 335 S.E. (2d) 809 (Ct. App. 1985).

The discovery of Carter as a witness was procured from sources independent of the illegally obtained statement. First, Copeland disclosed to McBride the name of "John Carter," and McBride immediately provided her lawyer and the police with this information. Second, Copeland's brother actually assisted the police in locating Carter. Because the discovery of John Carter was procured from lawful sources independent of the illegal actions of the police, we find no error in admitting his testimony.

II. *Admission of References to Conversations Police Had with Copeland's Husband*

Copeland asserts that the spousal privilege extends to statements made by her husband to police. Therefore, she contends the trial court erred in allowing police officers to testify that after talking with her husband, they discovered a car owned by her that matched the description of the vehicle seen by a neighbor at the Victim's house on March 22nd. We disagree.

The spousal privilege provides that in criminal cases married persons cannot be compelled to testify against their spouses concerning any communication made between them during their marriage. S.C. Code Ann. § 19-11-30 (Supp.

1995). We have held that the right to exercise the privilege against disclosing marital communications is solely that of the witness/spouse from whom the privileged information is being sought. *State v. Motes*, 264 S.C. 317, 215 S.E. (2d) 190 (1975).

At trial, Copeland's husband elected not to testify against his wife by asserting his spousal privilege. He was not called as a witness, and the trial court ruled that the content of Mr. Copeland's statement to the police was inadmissible. The testimony presented merely referred to the fact that conversations with Copeland's husband led the police to the discovery of Copeland's vehicle, thus providing them with sufficient probable cause to suspect her. The testimony did not reveal the actual content of Mr. Copeland's statement to the police nor did it disclose marital communications. On these facts, Mr. Copeland's assertion of the spousal privilege at trial did not preclude the police from stating what transpired after they talked with him. Accordingly, we find no error in admitting the police testimony regarding their investigation.

### III. *Denial of Copeland's Motion for a Mistrial*

Copeland next alleges that the closing argument of the solicitor was so prejudicial that it denied her a fair trial and, therefore, the trial court erred in failing to grant her mistrial motion. We disagree.

A solicitor's closing argument must not appeal to the personal biases of the jurors. In addition, the argument may not be calculated to arouse the jurors' passions or prejudices, and its content should stay within the record and reasonable inferences to it. *State v. Linder*, 276 S.C. 304, 278 S.E. (2d) 335 (1981). The trial court has broad discretion when dealing with the propriety of the solicitor's argument, including the question of whether to grant a defendant's mistrial motion. *Id.; State v. Dawkins*, 297 S.C. 386, 377 S.E. (2d) 298 (1989). The trial court's discretion will not be overturned absent a showing of an abuse of discretion amounting to an error of law that prejudices the defendant. *State v. Washington*, 315 S.C. 108, 432 S.E. (2d) 448 (1992); *Dawkins, supra*. On appeal, the appellate court will view the alleged impropriety of the solicitor's argument in the context of the entire record. The appellant has the burden of proving she did not receive a fair trial because of the alleged improper argument. *Id.*

Copeland's first objection to the closing argument concerned the solicitor's references to the contents of conversations the police had with her husband and his employer. The trial court sustained Copeland's objection telling the solicitor that he could only refer to facts already in evidence. The second objection came when the solicitor speculated that Copeland was involved in an extortion plan whereby she demanded money from men whom she told were the father of her children. The trial court again sustained Copeland's objection stating, "There is no evidence that that's what she was doing. . . . Stay away from it."

Next, Copeland objected to the solicitor's speculation that the reason Copeland visited the Victim at work on March 22nd was to ascertain whether he would have money that night. The trial court denied Copeland's objection ruling that the solicitor was arguing a permissible inference from the record. Copeland's next objection came when the solicitor stated that Copeland told Carter that the Victim had plenty of money and carried two wallets. The trial court informed the solicitor that the evidence in the record did not support this comment and to stay away from it. The trial court instructed the jury to disregard the solicitor's remark.

The next objection came when the solicitor told the jury that Carter met with Copeland to divide the money taken from the Victim. The trial court sustained the objection ruling that the argument was not supported by the evidence and charged the following:

> Ladies and gentlemen of the jury, this is why I told you that you believe what you hear from the witness stand. These two attorneys, they're advocates. They're trying to express their positions in this case. They would not intentionally say something that they didn't think was in the record, but in their enthusiasm sometimes, that might happen. That's why you have to rely on your collective memories of what took place.

The sixth objection came when the solicitor represented to the jury that Copeland obtained the Victim's wallets, and that when Carter ran from the crime scene, she called him to come back. The trial court overruled this objection stating that the solicitor was merely commenting on circumstantial evidence

in the record. The final objection came when the solicitor argued that Copeland was the mastermind in the plan and, therefore, Carter was less culpable then she. In response to this objection, the trial court warned the solicitor that he was "skating on thin ice."

We take this opportunity to caution counsel to confine their comments to the facts presented and reasonable inferences from such facts. In this matter, Copeland's objection to the solicitor's comments were either properly overruled, or the objectionable portion was corrected by a curative charge. Based upon our review of the record as a whole, the solicitor's comments did not infect Copeland's trial with unfairness to the extent that her conviction was denial of due process. *See Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed. (2d), 144 (1986); *State v. Hawkins,* 292 S.C. 418, 357 S.E.(2d) 10 (1987), *overruled on other grounds, State v. Torrence,* 305 S.C. 45, 406 S.E. (2d) 315 (1991). Because Copeland has not established that she was deprived of a fair determination of her guilt or innocence, the trial court did not abuse its discretion in denying her mistrial motion.

IV. *Denial of the Motion for a Directed Verdict*

Copeland contends the trial court erred in refusing to direct a verdict in her favor on the armed robbery charge because the evidence failed to establish that property was taken from the Victim. We disagree.

The trial court has a duty to submit the case to the jury where the evidence is circumstantial, if there is any evidence which reasonably tends to prove the guilt of the accused or from which his guilt may be fairly and logically deduced. *State v. Williams,* 303 S.C. 274, 400 S.E. (2d) 131 (1991); *State v. Edwards,* 298 S.C. 272, 379 S.E. (2d) 888 (1989). In ruling on a motion for a directed verdict, the trial court is concerned with the existence of evidence, not with its weight. *State v. Edwards, supra.* When this Court reviews the denial of a motion for a directed verdict, it views the evidence in the light most favorable to the nonmoving party, and if there is any direct or circumstantial evidence which reasonably tends to prove the guilt of the accused, refusal by the trial court to direct a verdict is not error. *State v. Stokes,* 299 S.C. 483, 386 S.E. (2d) 241 (1989); *State v. Edwards, Supra; State v. Irvin,* 270 S.C. 539, 243 S.E. (2d) 195 (1978).

Evidence existed from which Copeland's guilt of the charge of armed robbery could be fairly and logically deduced. McBride and Carter testified that Copeland knew the Victim had a large amount of cash and that the sole purpose of the plan was to steal money from the Victim. Other testimony established that (1) the Victim had cashed two checks totalling in excess of one thousand dollars immediately prior to being murdered; (2) the Victim always carried two wallets; (3) the Victim had at least one and possibly both wallets in his pockets prior to being murdered; and (4) the Victim's wallets were not found after his murder. We therefore conclude that sufficient circumstantial evidence was presented to warrant submission of the armed robbery charge to the jury.

For the foregoing reasons, the decision of the trial court is

Affirmed.

FINNEY, C.J., and TOAL, MOORE and WALLER, JJ., concur.