559 S.E.2d 352

**The STATE, Respondent,**

v.

**Leon CROSBY, Appellant.**

**No. 3426.**

Court of Appeals of South Carolina.

Heard Dec. 4, 2001.
Decided Dec. 17, 2001.
Rehearing Denied Feb. 20, 2002.

388

Assistant Appellate Defender Robert M. Dudek, of the South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Robert E. Bogan, Assistant Attorney General Toyya Brawley Gray, Assistant Attorney General W. Rutledge Martin; and Solicitor Warren B. Giese, all of Columbia, for respondent.

ANDERSON, J.

A jury found Leon Crosby guilty of voluntary manslaughter. He was sentenced to seventeen years imprisonment. Crosby asserts three errors on appeal. We affirm.

### *FACTS/PROCEDURAL BACKGROUND*

On December 28, 1998, Crosby and his girlfriend, Ketura Young, were visiting Monica Tucker in an apartment Monica shared with Shawanda Knox, and Shawanda's brother, Ryan Knox. Several other people, including Lavaris Dunham ("the victim"), were also visiting the apartment. When Shawanda and Ryan returned home from work with Jessica Herring, a co-worker, Shawanda became upset with the number of people in the apartment and wanted them to leave. Monica refused to ask her guests to leave. Shawanda left and went to a nearby apartment where she called the police to intervene.

During this time, Crosby became upset when the victim commented that he could "take" Crosby's girlfriend. Crosby yelled at the victim, pointed at Ketura, and told the victim to go ahead and try. The victim apologized to Crosby for upsetting him, and Crosby walked outside the apartment to "cool off." Deputy Ernest Nesbitt of the Kershaw County Sheriff's Office approached the apartment in response to Shawanda's call as Crosby exited the apartment. Deputy Nesbitt heard Crosby mention that he needed to "clear his head."

Deputy Nesbitt attempted to resolve the disagreement between the roommates. Shawanda, who had returned after calling the police, again left the apartment upon Deputy Nesbitt's advice. The deputy then departed. Shawanda returned again to retrieve some of her belongings. An argument between Shawanda and Monica ensued, which escalated into a physical altercation outside the apartment involving Shawanda, Monica, Ryan, and Monica's cousin, Jenelle Outten. During the fight, Crosby shot the victim in the neck in the open doorway of the apartment. The victim died from his injuries.

Crosby and several others fled the scene in Jessica's car. Crosby averred several times to the occupants of the car that he did not intend to shoot the victim. The next morning, Crosby turned himself in to the police. He gave a statement that the victim charged at him while he was attempting to help break up the fight between Shawanda and the others. Crosby stated that when the victim charged him, he "seen (sic) his life in danger" and took his gun out of his pocket, closed his eyes, and pulled the trigger.

At trial, Calvin Hill testified he was inside the apartment when he witnessed Crosby attempting to break up the fight. Hill saw the victim exit the apartment and approach Crosby. Hill heard Crosby telling the victim to back up, and then Crosby walked into the apartment. According to Hill, the victim then "charged" at Crosby with his hands up and without any weapons in them. Hill heard the gunshot as both men were standing in the doorway and then saw the victim fall to the floor.

Ketura testified that when Crosby attempted to break up the fight outside the apartment, the victim told Crosby not to touch the girls and the two men shoved each other. While the two men were near the doorway, Crosby directed Ketura into the apartment, and she then heard the gunshot.

Crosby testified that while attempting to break up the fight, the victim told him to take his hands off Jenelle. The two exchanged words and shoved each other. Crosby stated that as he turned to push Ketura into the apartment out of harm's way, he glanced back to see the victim coming toward him. The victim was reaching behind his back, and Crosby believed the victim had a weapon. Crosby pulled a gun out of his pocket as he turned around and shot the gun, though he did not realize right away that the gun had discharged.

## *LAW/ANALYSIS*

### I. INVOLUNTARY MANSLAUGHTER CHARGE

Crosby first argues the trial court erred in failing to charge the jury on the law of involuntary manslaughter because the evidence showed he acted in self-defense and the shooting "appeared more accidental than intentional." We disagree.

At the conclusion of the defense's case, Crosby withdrew his request for a charge on the law of accident, admitting no testimony was presented to show an accidental shooting. Because Crosby's testimony showed he turned around to find the victim "on top of him," Crosby argued the evidence demonstrated he acted recklessly and negligently in handling the gun. Crosby contended he was entitled to a charge on involuntary manslaughter based on the premise that the negligent handling of a loaded gun warrants a finding of involuntary manslaughter.

"The law to be charged to the jury is determined from the evidence presented at trial." *State v. Hill*, 315 S.C. 260, 262, 433 S.E.2d 848, 849 (1993) (citation omitted). If there is any evidence to support a jury charge, the trial judge should grant the request. *State v. Shuler*, 344 S.C. 604, 545 S.E.2d 805 (2001). The trial court commits reversible error if it fails to give a requested jury charge on an issue raised by the evidence. *State v. Burriss*, 334 S.C. 256, 513 S.E.2d 104 (1999). The trial court's refusal to give a requested jury

instruction must be "both erroneous and prejudicial" to warrant reversal. *State v. Harrison,* 343 S.C. 165, 173, 539 S.E.2d 71, 75 (Ct.App.2000), *cert. denied* (citation omitted).

▆▆▆ To be entitled to a charge on involuntary manslaughter, there must be evidence that the defendant either:

(1) killed another without malice and unintentionally, but while "engaged in the commission of some unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm"; or

(2) killed another without malice and unintentionally, but while "acting lawfully with reckless disregard of the safety of others."

*Burriss,* 334 S.C. at 264–65, 513 S.E.2d at 109 (citation omitted). Involuntary manslaughter is at its heart an unintentional act. *See Douglas v. State,* 332 S.C. 67, 74, 504 S.E.2d 307, 310–11 (1998) ("[W]here a defendant intentionally arms himself and shoots into a crowd ... he is not entitled to an involuntary manslaughter charge.") (citations and footnote omitted).

Our Supreme Court has considered whether a killing was intentional or accidental in determining whether the facts of a case supported a charge of involuntary manslaughter. In *Burriss,* the defendant was threatened and then attacked by the victim and another male. During the fight, the defendant drew a gun and fired two rounds into the ground. One attacker backed away, yet continued to verbally threaten the defendant and urged his accomplice—the victim—to attack the defendant again. At this point, the defendant was on the ground, separated from his gun. As the victim drew closer, the defendant reached for the gun. As he picked it up, the weapon discharged, accidently killing the victim: "When [the victim] began moving threateningly toward [the defendant], he snatched his gun up and it fired. [The defendant] stated he was scared and his hand was shaking when the gun went off: 'It was an accident. I didn't try to shoot nobody.' " *Burriss,* 334 S.C. at 263, 513 S.E.2d at 108 (footnote omitted).

The defendant was convicted of murder. On appeal, the defendant argued the trial judge erred by refusing to instruct the jury on the law of accident or involuntary manslaughter. The Supreme Court agreed, finding: (1) the factual scenario of

the case supported the defendant's argument that the shooting was accidental; and (2) the evidence would sustain a finding the defendant was lawfully armed in self-defense at the time the fatal shot occurred and the negligent handling of a loaded gun supported a finding of involuntary manslaughter. *Id.* at 263–65, 513 S.E.2d at 108–09. Accordingly, the *Burriss* Court reversed the conviction and remanded the case to the Circuit Court with instructions to charge the jury with the law of accident and involuntary manslaughter. *Id.* at 266, 513 S.E.2d at 110.

By contrast, the defendant in *State v. Pickens,* 320 S.C. 528, 466 S.E.2d 364 (1996), admitted he and a co-defendant intentionally shot into an advancing crowd, killing two victims. On appeal, the defendant averred the trial judge erred in refusing to charge involuntary manslaughter. The Supreme Court disagreed, finding the defendant was not entitled to a charge of involuntary manslaughter because he had intentionally fired the gun. *Pickens,* 320 S.C. at 531–32, 466 S.E.2d at 366.

Crosby argues that testimony by Calvin Hill during cross-examination granted him the right to a charge of involuntary manslaughter:

The Solicitor: [Defense counsel] asked you and referred you specifically and asked you if you had mentioned in your statement [to the police] whether Mr. Crosby told you, "I didn't mean to." Do you remember that?

Hill: Yes.

The Solicitor: When did he tell you that?

Hill: When we got in the car.

The Solicitor: And that was after the shooting?

Hill: Yes.

The Solicitor: And did he tell you that it slipped?

Hill: Yes.

The Solicitor: He said the gun slipped?

Hill: Yes.

During his testimony, Crosby related the sequence of events during his fight with the victim:

Crosby: "When I seen him—when I glanced back, I seen his hands behind his back. So I ain't know what kind it was. That's when I reached in my pocket and turned

around. By the time I turned around, he was already up on me. And I just pow."

. . . .

Crosby: Going through the door. All right. As he's coming behind me, you know what I'm saying, he had his hand on me like this.

Defense Counsel: Okay. Speak loud.

Crosby: Well, he was already—well, as he was charging me, he done took his hand—by his hand being like that, it frightened me. I ain't never seen what's happening in his left hand.

Defense Counsel: Did you see anything in his hand?

Crosby: No, sir. Not at the moment. I couldn't see his hands.

Defense Counsel: All right then. What happened?

Crosby: That's when I turned around. And that's when his arm slowly from behind his back. And as I turned around, before I could turn around, I've done hit that pocket.

Defense Counsel: You pulled out the pistol.

Crosby: He came up, turned around, and boom.

■ After a careful review of the record, we find no evidence was presented at trial that would support a charge of involuntary manslaughter. Crosby consistently stated he deliberately retrieved the gun from his pocket and pulled the trigger. Crosby testified: "I went in my pocket and pulled that gun out. I closed my eyes and pulled the trigger." Shooting at a person is an unlawful activity that would normally result in great bodily harm or death. Because Crosby's actions were intentional, unlawful, and would normally cause great bodily harm or death, his actions did not meet the definition of involuntary manslaughter.

Crosby further argues that the trial court erred in failing to charge the law of involuntary manslaughter because the facts of his case are similar to the facts in *Burriss*. However, the facts are in actuality more similar to the circumstances in *Pickens*. Crosby admitted he intentionally shot the gun. Furthermore, no evidence was presented that the gun accidentally discharged. Crosby also waived the defense of accident

at trial. Although it appears that Crosby may not have intended the shooting to result in the victim's death, no evidence was presented at trial to support Crosby's claim that the shooting was not intentional. The situation presented in the instant case is analogous to the factual circumstances reviewed by the Supreme Court in *State v. Craig,* 267 S.C. 262, 227 S.E.2d 306 (1976), *Bozeman v. State,* 307 S.C. 172, 414 S.E.2d 144 (1992), and *State v. Smith,* 315 S.C. 547, 446 S.E.2d 411 (1994). In each of these cases, the Court ruled the defendant was *not* entitled to an involuntary manslaughter charge.

In *State v. Craig,* the defendant admitted that he intentionally fired his shotgun at the victim, but claimed he only meant to shoot over the victim's head. The Supreme Court found no error with the trial judge's refusal to charge the law of involuntary manslaughter. *Id.* at 269, 227 S.E.2d at 310.

Relying upon *Craig,* the Supreme Court in *Bozeman v. State* refused to find fault with defense counsel's failure to request a charge of involuntary manslaughter:

> In *State v. Craig,* 267 S.C. 262, 227 S.E.2d 306 (1976), this Court found no error in the refusal to charge the law of involuntary manslaughter when the defendant admitted intentionally firing the gun, but claimed he only meant to shoot over the victim's head. Here, petitioner testified at trial, "I pulled the pistol up and I shot." Petitioner stated that he never aimed the pistol. He did, however, intend to shoot the gun. There is no evidence to support an allegation of mere criminal negligence in the use of a dangerous instrumentality. Because the evidence in the record does not support a charge of involuntary manslaughter, trial counsel's failure to request a jury charge of involuntary manslaughter was not deficient performance.

*Id.* at 177, 414 S.E.2d at 147.

In *State v. Smith,* the defendant was convicted of stabbing the victim following an argument over a $2.00 debt the victim owed the defendant. On appeal, the defendant asserted the trial court erroneously denied his request for an involuntary manslaughter jury charge. Following the precedent recited in *Craig* and *Bozeman,* the Supreme Court affirmed the trial judge's decision:

Involuntary manslaughter was recently reviewed in *Bozeman v. State,* 307 S.C. 172, 414 S.E.2d 144 (1992) (citing *State v. Barnett,* 218 S.C. 415, 63 S.E.2d 57 (1951)), where we stated:

> [f]irst, involuntary manslaughter may be described as the killing of another without malice and unintentionally, but while one is engaged in the commission of some unlawful act not amounting to a felony and not naturally tending to cause death or bodily harm. The second situation may be described as the killing of another without malice and unintentionally but while engaged in the doing of a lawful act with a reckless disregard of the safety of others.

*Id.,* 307 S.C. at 176, 414 S.E.2d at 146–147.

Our analysis in *Bozeman* relied heavily on our earlier decision in *State v. Craig,* 267 S.C. 262, 227 S.E.2d 306 (1976). In *Craig,* we found no error in failing to charge involuntary manslaughter where a defendant intentionally fired a gun, but claimed that he was only firing above the victim's head. In *Bozeman,* on facts similar to *Craig,* we stated that there was "no evidence to support an allegation of mere criminal negligence in the use of a dangerous instrumentality."

The record here demonstrates that Smith acted intentionally in wielding the knife. When Evans grabbed Smith, Smith pulled the knife, a dangerous instrumentality, and stabbed at Evans. Just as in *Craig,* whether Smith intended to harm Evans is irrelevant. The stabbing is clearly not a lawful act, and the intentional use of a dangerous instrumentality does not support the allegation of mere criminal negligence. Because Smith's actions were outside the definition of involuntary manslaughter as we restated recently in *Bozeman,* the trial court did not commit error in refusing to instruct the jury on the law of involuntary manslaughter.

*Id.* at 550, 446 S.E.2d at 413.

We conclude no evidence was presented in the case *sub judice* that would support a charge of involuntary manslaughter.

## II. MISTRIAL

Crosby next argues the trial court erred by failing to grant his motion for a mistrial after the solicitor's closing argument. We disagree.

In closing, the solicitor made the following statement:

There was no self-defense. You have got the power, you 12 have got the power to come back with a verdict that says self-defense. Based on the evidence of this case and the reasonable inferences, I submit to you that would be paramount (sic) [tantamount] to giving Leon Crosby a license to kill.

Crosby immediately objected to the State's argument as appealing to the passion and prejudice of the jury. Before allowing the State's closing argument to continue, the trial judge suggested the solicitor "tone it down a bit."

After the State finished its closing argument, Crosby reiterated his argument regarding the "license to kill" statement and moved for a mistrial. Although the trial court found the "license to kill" statement was "marginally inappropriate," the court determined that a curative instruction would correct the problem, and it denied Crosby's motion for mistrial. The trial court later instructed the members of the jury that they were not to be motivated by sympathy, passion, or prejudice. Crosby did not complain about the curative instruction or move for a mistrial after the trial court instructed the jury.

Crosby now argues the trial court erred in failing to grant the motion for mistrial because the State's "license to kill" argument prejudiced him.

Initially, we note this issue is probably not preserved for review. Although Crosby complained about the State's closing argument, he did not object to the curative instruction given by the trial judge, nor did he move for a mistrial at the end of the jury instructions. Where a curative instruction is given and the objecting party does not contemporaneously challenge the sufficiency of the corrective charge or move for mistrial, no issue is preserved for review. *See State v. George*, 323 S.C. 496, 476 S.E.2d 903 (1996) (holding no issue is preserved for appellate review if objecting party accepts judge's ruling and does not contemporaneously make addition-

al objection to sufficiency of curative charge or move for mistrial).

In any event, the decision to grant or deny a mistrial is within the sound discretion of the trial judge. *State v. Dawkins,* 297 S.C. 386, 377 S.E.2d 298 (1989). "The granting of a motion for a mistrial is an extreme measure which should be taken only where an incident is so grievous that prejudicial effect can be removed in no other way." *State v. Beckham,* 334 S.C. 302, 310, 513 S.E.2d 606, 610 (1999) (citation omitted).

When considering the propriety of a solicitor's closing argument, the trial court is vested with broad discretion, including the discretion to grant or deny the defendant's mistrial motion. *State v. Durden,* 264 S.C. 86, 212 S.E.2d 587 (1975); *see also State v. McCray,* 332 S.C. 536, 506 S.E.2d 301 (1998) (demonstrating appellate review of a trial judge's denial of defendant's mistrial motion is governed by abuse of discretion standard); *State v. Brown,* 333 S.C. 185, 191, 508 S.E.2d 38, 41 (Ct.App.1998) ("The propriety of closing argument is vested in the broad discretion of the trial judge.") (citation omitted). The State's closing arguments must be confined to evidence in the record and the reasonable inferences that may be drawn from the evidence. *State v. Copeland,* 321 S.C. 318, 468 S.E.2d 620 (1996). Furthermore, the solicitor's closing argument must not appeal to the personal biases of the jurors. *Id.* However, to be entitled to a new trial for improper closing arguments, the test is whether "the Solicitor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Hamilton,* 344 S.C. 344, 362, 543 S.E.2d 586, 596 (Ct.App.2001).

The solicitor's argument in the present case was merely a comment on the lack of evidence of self-defense and clearly did not appeal to the passions or prejudice of the jury. The solicitor stayed within the evidence presented at trial and the reasonable inferences therefrom. Although the trial court found the argument "marginally inappropriate," it was an isolated incident. Reviewing the entire record, we do not find that the single comment regarding a "license to kill" so infected the trial with unfairness as to make the conviction a denial of due process. Further, the trial judge's curative

instruction directed the jurors that their verdict was not to be motivated by passion or prejudice. Accordingly, we find the trial court's curative instruction cured any error in the solicitor's argument, and the trial court did not abuse its discretion in denying Crosby's mistrial motion.

## III.  PHOTOGRAPH

Crosby argues the photograph of the victim's body was unduly prejudicial and the trial court erred in allowing its admission. We disagree.

The State sought to admit several photographs of the victim's body at trial. A photograph marked Exhibit 8 was taken outside the apartment. Exhibit 8 predominantly showed the victim's feet lying outside the door and a small amount of blood. Crosby did not object to the admission of Exhibit 8. The State later sought to admit a photograph marked Exhibit 9. Exhibit 9 was taken from a different angle to show the entire length of the victim's body, and it also showed some blood. The State argued the position of the body was relevant to its theory that the victim was shot from behind and Exhibit 9 displayed the positioning of the body more accurately than the other photographs. Although Crosby argued Exhibit 9 was unduly prejudicial, the trial court determined the photograph had probative value and was not unduly prejudicial, especially in light of the fact that Exhibit 8 already displayed some blood.

The State admitted Exhibit 9 into evidence during a responding police officer's testimony regarding the location and position of the victim's body. Dr. Joel Sexton, a forensic pathologist, later testified that the victim died from the gunshot wound to the neck that severed the carotid artery and transected the spinal cord.

"The relevance, materiality and admissibility of photographs are matters within the sound discretion of the trial court and a ruling will be disturbed only upon a showing of an abuse of discretion." *State v. Rosemond,* 335 S.C. 593, 596, 518 S.E.2d 588, 589–90 (1999). If the photographs serve to corroborate testimony, it is not an abuse of discretion to admit them. *State v. Nance,* 320 S.C. 501, 466 S.E.2d 349 (1996); *State v. Middleton,* 288 S.C. 21, 339 S.E.2d 692 (1986).

However, photographs calculated to "arouse the sympathy or prejudice of the jury should be excluded if they are irrelevant or not necessary to substantiate material facts or conditions." *State v. Brazell,* 325 S.C. 65, 78, 480 S.E.2d 64, 72 (1997) (citations omitted).

In the instant case, Exhibit 9 corroborated the testimony of the responding officer regarding the position of the victim's body. The photograph also corroborated the testimony of Dr. Sexton regarding the injuries suffered by the victim. Although the photograph showed some blood, we do not believe the photograph was offensive or calculated to arouse sympathy or prejudice. Further, Crosby did not object to the admission of Exhibit 8, which also showed the victim's body and blood. Because Exhibit 9 was relevant to corroborate the testimony of witnesses and did not appeal to the jury's passions or prejudice, we find the trial court did not abuse its discretion in admitting Exhibit 9 into evidence.

## CONCLUSION

Based on the foregoing, the trial court's rulings are **AFFIRMED.**

CONNOR and HOWARD, JJ., concur.