**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Jeremy Savoy Cornish, Appellant.

Appellate Case No. 2022-001536

————

Appeal From Lexington County
Debra R. McCaslin, Circuit Court Judge

————

Opinion No. 6146
Heard June 11, 2025 – Filed May 13, 2026

————

**AFFIRMED**

————

Chief Appellate Defender Wanda H. Carter, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, and Assistant
Attorney General Tommy Evans, Jr., both of Columbia,
and Solicitor Samuel R. Hubbard, III, of Lexington, all
for Respondent.

————

**MCDONALD, J.:** Jeremy S. Cornish appeals his convictions for murder and
burglary, arguing the circuit court erred in (1) finding a search warrant obtained in
the weeks before his trial cured the alleged constitutional violation arising from the
initial collection of his buccal swabs, and (2) declining to instruct the jury on the
defense of alibi.  We affirm.

**Facts and Procedural History**

In December 2019, Donnovin Haynes and Sheldon Livingston lived at Woodland Village Apartments in Lexington County. Haynes's friends, Duwan Williams and Branton Booker, slept on the apartment couches when they needed a place to stay.

On December 17, 2019, Haynes and Williams returned from work around 3:00 a.m. Later that morning, Haynes awoke to the sound of gunfire coming from inside the apartment. He ran to his bathroom, secured the door, and locked himself in the bathroom closet. While hiding, Haynes heard the breaching of doors and an unfamiliar voice say, "Where's it at?" When an intruder attempted to kick in the closet door, Haynes used his weight to keep the door closed. The assailant abandoned his effort to breach the door after another intruder said, "Here it is. I found it."[1] Once the intruders were gone and Haynes was able to exit the bathroom, he saw a body beneath a pile of clothes in the hallway. He grabbed his pants, jumped from a window, and fled to a neighbor's apartment to call 911.

Officer Scott Purdy of the Lexington County Sheriff's Department (LCSD) responded to Haynes's 10:59 a.m. 911 call and arrived on scene to find Haynes in the parking lot. When Haynes reported that his friends had been shot, the responding officers kicked in the locked front door to access the apartment.

Inside the apartment, the officers observed blood and could hear someone—later identified as Williams—struggling to breathe. They found Williams bleeding heavily, wrapped in a blanket on a couch. As they cleared the apartment, officers found open cabinets and the contents from a hallway closet dumped onto the floor. They also found Livingston's body—he had been shot and left on the floor in his bedroom. Officers then discovered a second decedent, Booker, beneath the pile of items pulled from the hallway closet.

After calling for EMS, Officer Purdy worked to secure the scene while Detective John Donnelly rendered aid to Williams. When asked if he knew who shot him, Williams replied, "No, not at all. I was asleep." Williams eventually succumbed to his injuries.

Detective Donnelly later observed blood on a door jamb, suggesting some incident had occurred near the front door. Crime Scene Investigator Patrick Ward also

---

[1] Evidence suggested Booker was known to sell drugs from the apartment.

noted a small blood trail from the laminate floor near the front door heading toward the area where Booker's body was found.

The LCSD recovered several 9mm casings and projectiles consistent with a .38mm revolver from the apartment. Investigator Ward photographed foot impressions near the interior doors and processed the scene for fingerprints, touch DNA, and blood. As part of the evidence collection process, Investigator Ward swabbed the dead bolt latch on the inside of the apartment door for touch DNA.

Law enforcement received several tips in the days following the home invasion. One witness reported that around 11:00 a.m. on the day of the murders, she saw a heavyset black male with a Band-Aid on his face pass her on a bicycle and get into a white truck with dual rear wheels. The truck was hauling equipment in the rear of the Woodland Village parking lot and was travelling very fast. This seemed strange to her because of the speed bumps in the area. This witness saw the heavyset male throw the bike down and get into the truck; he then exited and propped the bike up against a pole before re-entering the vehicle.

Additional tips to the LCSD resulted in the development of Justin Hopkins as a potential suspect, and in the late hours of December 20, 2019, investigators began to investigate Hopkins's connection to the murders. Officers confirmed Hopkins lived at the Landmark Apartments and sought a search warrant for his apartment. On December 21, Detective James Pratt was assigned to conduct surveillance of the Hopkins apartment while other officers obtained a search warrant. Detective Pratt observed a white truck with dual rear wheels arrive at the apartment complex; a male matching Hopkins's description then exited the truck and entered the apartment. Upon notifying investigators of the truck matching the suspect vehicle's description, Detective Pratt was instructed to get the tag number and stop the vehicle. Detective Pratt waited until the truck was about a mile away from the apartment complex to initiate the traffic stop in an effort to avoid alerting Hopkins with his lights or siren. In addition to the truck's defective tag light, Pratt saw construction equipment in the bed of the truck and noted it matched the description of the vehicle seen leaving Woodland Village around the time of the murders.

During this traffic stop, Detective Pratt spoke with the truck's driver, Cornish, and Cornish's girlfriend. When asked for his identification, Cornish handed Detective Pratt his license and some December 17 paperwork from the South Carolina Department of Motor Vehicles (DMV) bearing Justin Hopkins's name. Although Cornish confirmed he had just driven Hopkins to the Landmark Apartments and

admitted he had known Hopkins for several years, he claimed their relationship was "fairly sterile." Cornish explained that he worked in a supervisory role with his uncle's construction company and used the truck to drive employees, including Hopkins, to work sites.

When questioned about his whereabouts on December 17, Cornish replied that he drove Hopkins to work that morning but later dropped him back off because rain prevented them from completing their scheduled job at McEntire Air Force Base. Cornish claimed he then went to the DMV to attend to issues with his driver's license but had to return later that day after obtaining money to pay outstanding fines and reinstate his license. Cornish did not admit to being with Hopkins at any other point on December 17; he told Detective Pratt that he remained at home with his girlfriend after completing his transactions at the DMV. He denied any knowledge of the December 17 murders and consented to both a search of the truck and the photographing of messages from his phone.

Other than Cornish's connection to Hopkins, officers found no incriminating evidence during their search of the truck, and Cornish was allowed to leave following the traffic stop. Officers later testified they were unaware of the extent of Cornish's involvement in the murders and were focused on the white truck and heavyset man (Hopkins) identified by witnesses.

Meanwhile, Lieutenant Jonathan Brock took over surveillance at the Landmark Apartments, where he observed an individual carrying two bags and matching Hopkins' description enter the back passenger seat of a vehicle. Because Lieutenant Brock was in an unmarked car, he called for assistance from a marked unit to stop the vehicle once it exited the parking lot.

Sergeant Aaron Poole stopped the Hopkins vehicle in his marked patrol car. Lieutenant Brock identified Hopkins in the back seat and saw him reaching toward the bags between his legs. Hopkings complied when instructed to raise his hands and exit the vehicle. Another officer seized the bags from the back seat and obtained a search warrant. The bag search revealed a black Glock handgun, an extended magazine, a .380 caliber Hi-Point, some bullets and casings, latex gloves, and two bags of powder that appeared to be heroin.[2] Field testing determined one bag contained heroin and the other contained heroin with methamphetamine or fentanyl; the total weight seized was 18.37 grams. Officers also seized several

---

[2] Later testing revealed these two guns were not involved in the murders.

items of clothing, including a white t-shirt with blood stains.[3]  Hopkins was arrested during this traffic stop.

Around that same time, the LCSD executed the search warrant at Hopkins's apartment, where they seized clothing, two cell phones, and some work boots. Bluestar testing of the boots indicated the presence of blood.[4]

The LCSD also obtained DMV video footage from the day of the murders.  This footage shows Cornish and Hopkins arriving at the DMV together on the morning of December 17.  Hopkins waited while Cornish conducted his business, and the two men then left the DMV.  At 2:03 p.m., Cornish returned, and he was issued a driver's license at 2:20 p.m.  Hopkins was already at the DMV conducting a transaction when Cornish arrived that afternoon to pay his fees.  Both Hopkins and Cornish had changed clothes since their DMV visit earlier that day.

On December 23, 2019, Cornish voluntarily participated in an interview with LCSD detectives and was asked if he would be willing to provide a DNA sample. Cornish initially agreed but then asked why his DNA was needed and requested an attorney.  Sergeant Anthony Creech testified that Cornish then re-engaged law enforcement by asking a series of questions; thus, he resumed questioning him. Sergeant Creech further testified that after he explained the purpose of the DNA collection, Cornish voluntarily provided buccal swabs for a DNA comparison.

On December 26, 2019, LCSD received Hopkins's Verizon Wireless records, which revealed text messages between Hopkins and Cornish on the afternoon of December 17.  At 1:03 p.m., Cornish texted Hopkins to "make sure you clean those tools."  And at 1:04, Cornish advised Hopkins to "erase these messages."

Cornish was arrested five days later and subsequently participated in another interview with LCSD, this time with counsel present.  According to Sergeant Creech, Cornish now admitted to having been with Hopkins at the DMV on the morning of December 17.  Cornish explained that he, Hopkins, and the rest of their crew worked at McEntire Airbase on the morning of December 17 for approximately half an hour before the rain began.  Cornish claimed that after dropping off the rest of the crew, he and Hopkins went to the DMV, Cornish's

---

[3] Williams's DNA was found on the bloody shirt retrieved from Hopkins's bag.
[4] The LCSD also seized work boots found at Cornish's apartment.

home, and Cornish's girlfriend's parents' house. The two men were headed back to Hopkins's apartment when Hopkins asked if Cornish wanted to buy some marijuana. They traveled to an apartment complex in the St. Andrews Road area where Hopkins exited the truck. Cornish claimed he remained in the truck, checking his email and receiving a phone call from a friend.

Cornish's wireless records showed an outgoing call at 9:45 a.m. to Willie Peterson, Cornish's uncle and employer, and a call at 9:51 a.m. from another contact. At 10:35 a.m., Cornish missed a call from the same contact. The next activity on the phone was an incoming call at 11:16 a.m. from Peterson.[5] Cornish claimed he ignored this call because he was working and further stated he never deleted any emails. Sergeant Creech reviewed Cornish's email inbox and deleted items folder, noting the most recent work email he received prior to December 17 was dated December 5, and it related to work to be performed on December 6 and 7.

Cornish told Sergeant Creech that he waited on Hopkins for a while and then began driving around looking for him. When Cornish found Hopkins nearby on a bicycle, he picked him up and drove to KJ's grocery so Hopkins could purchase cigarettes and cigars for them to use with the marijuana. Cornish stated he took Hopkins to the Landmark Apartments, where he waited while Hopkins went inside his apartment. When Hopkins returned, he showed Cornish some marijuana and heroin. Cornish indicated he took his share of the marijuana before leaving to meet his uncle to obtain the funds needed to reinstate his driver's license. He noted he ran into Hopkins later that afternoon at the DMV, where Hopkins requested a ride to Garners Ferry Road.

---

[5] These records further revealed Cornish began checking local news sites for information about the murders *before* LCSD issued its December 17 press release. At 11:38 a.m. on December 17, Cornish began visiting local news websites, including CrimePulse.com and Crime Stoppers of the Midlands; he revisited the news sites several times throughout the day. At 3:29 p.m., Cornish viewed a local news website's story indicating a third victim had died following a shooting at some Columbia area apartments. At 5:51 p.m., he viewed a story titled, "Triple Homicide Leaves Neighbors Nervous." The following day, Cornish conducted an internet search for the street value of 14 grams of heroin, and on December 19, he again checked a story about the triple homicide.

Cornish further explained that he told Hopkins to erase messages related to their discussion of drug activity and instructed Hopkins to clean the tools because Hopkins was his apprentice and a tape measure had gotten wet in the rain. The phone records contain messages about drug activities both before and after Cornish instructed Hopkins to delete the messages.

In August 2022, a Lexington County grand jury indicted Cornish and Hopkins for three counts of murder and one count of first-degree burglary. In September 2022, the LCSD obtained a search warrant for Cornish's DNA, and Sergeant Creech obtained additional buccal swabs. Cornish later filed a motion to suppress the DNA evidence, arguing he did not voluntarily consent to the initial collection of his DNA in December 2019.

During pretrial motions, the circuit court heard arguments on Cornish's motion to suppress and considered the State's proffered testimony. The circuit court found Cornish was in custody during the December 2019 interview and that the DNA collection after he requested counsel was involuntary. However, the circuit court held the DNA evidence was admissible under the independent source doctrine[6] because the State later obtained a valid search warrant for the DNA swabbing. The circuit court detailed these rulings in a written order.

The State later presented testimony from South Carolina Law Enforcement Division (SLED) experts as to footwear impressions, firearms, and DNA, and Agent Samuel Stewart testified as to his analysis of the swab from the interior dead bolt. Test results revealed Booker as the primary contributor of the DNA found on the dead bolt; Cornish was the next highest contributor. The jury found Cornish guilty of three counts of murder and one count of first-degree burglary. The circuit court imposed life sentences for the murders and a concurrent eighteen years' imprisonment for first-degree burglary.[7] Cornish timely appealed.

---

[6] As Cornish's DNA was already in the Combined DNA Index System (CODIS), the circuit court also inquired about its admission under the inevitable discovery doctrine, but the State did not pursue this alternative ground at trial due to the DNA mixture present in the door bolt sample.

[7] Cornish and Hopkins were tried separately. Hopkins was also convicted of the burglary and murders and likewise sentenced to life imprisonment. *See State v. Hopkins*, 447 S.C. 240, 924 S.E.2d 883 (Ct. App. 2025).

**Standard of Review**

"In criminal cases, appellate courts sit to review errors of law only." *State v. English*, 443 S.C. 49, 55, 902 S.E.2d 385, 388 (2024).

> [A]ppellate review of a motion to suppress based on the Fourth Amendment involves a two-step analysis. This dual inquiry means we review the trial court's factual findings for any evidentiary support, but the ultimate legal conclusion … is a question of law subject to de novo review.

*State v. Frasier*, 437 S.C. 625, 633-34, 879 S.E.2d 762, 766 (2022).

**Analysis**

**I. Admission of DNA Evidence**

Cornish argues the circuit court erred in admitting his DNA results after finding this evidence was admissible under the independent source rule. He further argues the search warrant was not "genuinely independent" from the earlier unlawful collection of his DNA. We disagree.

> The Fifth Amendment guarantees the right to speak with counsel upon request in a custodial setting. If a suspect invokes [his] right to counsel, police interrogation must cease unless the suspect [himself] initiates further communication with police. However, police officers are not required to cease questioning a suspect unless [the] request for counsel is unambiguous.

*State v. Wannamaker*, 346 S.C. 495, 499, 552 S.E.2d 284, 286 (2001) (citations omitted).

> When analyzing a criminal defendant's invocation of [the] right to counsel, a trial court must make two separate inquiries:

First, courts must determine whether the accused actually invoked his right to counsel. Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.

*State v. Johnson*, 413 S.C. 458, 466-67, 776 S.E.2d 367, 371 (2015) (citations omitted) (quoting *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (per curiam)).

"The 'fruit of the poisonous tree' doctrine provides that evidence must be excluded if it would not have come to light but for the illegal actions of the police, and the evidence has been obtained by the exploitation of that illegality." *State v. Moore*, 429 S.C. 465, 478-79, 839 S.E.2d 882, 889 (2020) (quoting *State v. Copeland*, 321 S.C. 318, 323, 468 S.E.2d 620, 624 (1996)). "The purpose of the exclusionary rule is to deter law enforcement officers from committing Fourth Amendment violations." *Id.* at 478, 839 S.E.2d at 889. Still, "'courts have recognized several exceptions to the exclusionary rule,' including, among others, the independent source doctrine, inevitable discovery, and good-faith reliance." *Id.* (quoting *State v. Adams*, 409 S.C. 641, 647 & n.3, 763 S.E.2d 341, 345 & n.3 (2014)).

"[T]he independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Utah v. Strieff*, 579 U.S. 232, 238 (2016). The independent source doctrine rests "upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." *Murray v. United States*, 487 U.S. 533, 542 (1988). "[T]he inevitable discovery doctrine provides that illegally obtained information may nevertheless be admissible if the prosecution can establish by a preponderance of the evidence that the information would have ultimately been discovered by lawful means." *Moore*, 429 S.C. at 481, 839 S.E.2d at 890 (quoting *State v. Cardwell*, 425 S.C. 595, 601, 824 S.E.2d 451, 454 (2019)).

Here, law enforcement initially obtained Cornish's buccal swab following his voluntary interview on December 23, 2019. As noted above, Cornish withdrew his initial consent when asked if he would consent to providing a swab for DNA comparison. He then requested an attorney, stating, "Listen, I—I'd rather be getting a lawyer involved in this here because I don't, you know, need nothing

fishy going on." Sergeant Creech testified that Cornish reengaged the officers by asking a series of questions; thus, Creech resumed his questioning and—after additional explanation and discussion—Cornish again agreed to provide a swab. According to Sergeant Creech, "It appeared to us that once we answered his questions and concerns about the process that he had no objection to giving that to us." Still, Sergeant Creech noted, "Two years ago in hindsight I can certainly see how looking over this it becomes an issue. If we had felt like there was a question of voluntariness at the time, we wouldn't have collected the swab." He further testified Cornish was not in custody at that time, law enforcement was interviewing him as a potential witness, and Cornish left voluntarily at the conclusion of the interview. That same day, the LCSD sent Cornish's sample to SLED for testing. This sample was included in SLED's DNA reports from 2020 and 2021.

Later, in preparing for trial, the State obtained a search warrant for Cornish's buccal swab to conduct a comparison analysis with evidence in the case. The affidavit attached with the search warrant application notes witnesses reported seeing a person matching Hopkins's description get into a white dual wheeled truck at the Woodland Village apartments around the time of the homicides. This affidavit described the traffic stop and subsequent conversation with Cornish, noting the investigation revealed Cornish was not truthful about the extent of his contact with Hopkins throughout the day of the murders. The warrant affidavit referenced surveillance video from the DMV and KJ's grocery as well as Hopkins's phone records showing Cornish told him to "clean those tools off" and "erase these messages." The affidavit further noted Cornish's DNA was relevant to compare against evidence collected from the crime scene and other items seized during the investigation. Regarding the search warrant, Sergeant Creech stated:

> [T]he probable cause set forth in the search warrant is based on things that were developed prior to that testimony with him on the 23rd or independently obtained without necessarily needing his testimony after that fact, so it's all information we would have had without his cooperation, which we would have gotten long-term and he would still have been developed as [a] suspect in the case and we ultimately would have obtained that swab without his cooperation and we would have done so under these—these circumstances.

In addition to addressing the 2022 warrant affidavit, Sergeant Creech noted SLED had already completed "quite a bit of testing" when he obtained the September 2022 warrant. He explained he obtained the search warrant because he was made aware that there were potential issues with the 2019 DNA collection, and the solicitor believed any such issues could be remedied with a warrant. Sergeant Creech clarified that he did not inform the magistrate that prior samples had been obtained and tested because the probable cause for the warrant was not based upon these prior results. Sergeant Creech further testified that he told the magistrate he was seeking the search warrant years after the incident due to an issue with the initial DNA collection, but he did not report the prior DNA results because he did not want to influence the magistrate's decision.

We see no error in the circuit court's finding that the independent source doctrine allowed for the admission of this DNA evidence. Cornish does not challenge the sufficiency of the September 2022 buccal swab warrant; instead, he argues the resulting DNA evidence must be excluded because the warrant was not "genuinely independent" since the decision to seek it was directly tied to the illegality in the initial collection of Cornish's DNA.

Cornish relies on *United States v. Hill*, which requires, "To find the search with a warrant 'genuinely independent,' the unlawful search must not have affected (1) the officer's 'decision to seek the warrant' or (2) the magistrate judge's 'decision to issue [it].'" 776 F.3d 243, 251 (4th Cir. 2015) (quoting *Murray*, 487 U.S. at 542). However, in *Hill*, law enforcement only obtained the warrant after a drug detection dog alerted to the presence of narcotics in the parolee's apartment. *Id.* at 246. The Fourth Circuit remanded that matter for a determination of whether "the information gained from the illegal walk-through and dog sniff" affected the officer's decision to seek a warrant because the district court had only considered whether the results affected the magistrate's decision to issue the warrant. *Id.* at 253. Notably, the officer in *Hill* testified that he decided to seek the warrant because of paraphernalia seen during the walk-through as well as the dog's alerting in multiple areas of the apartment. *Id.*

This case differs from *Hill* because the warrant was not obtained based on information gleaned from the arguably improper 2019 collection of Cornish's buccal swabs. Sergeant Creech testified he obtained the search warrant because he was made aware that there were potential issues with the 2019 swab collection, and the solicitor believed such issues could be remedied with a proper search warrant. The probable cause for the 2022 warrant was based upon information the LCSD

obtained prior to the questionable interview collection in December 2019, as well as information law enforcement obtained—or would have obtained—independently of Cornish's interview. Moreover, Sergeant Creech testified that law enforcement obtains buccal swabs from all significant parties during an investigation to run against samples gathered at a crime scene.

Further, although the circuit court did not rely on inevitable discovery, we find the DNA results also fall within the inevitable discovery exception to the exclusionary rule. Even if we assume officers violated Cornish's constitutional rights by continuing to engage him after he asked for counsel and in obtaining the 2019 swab, it cannot be denied that law enforcement would have inevitably obtained Cornish's DNA through other means. Cornish's arrest was not based upon the results of any DNA testing because those results were not available until 2020 and 2021, long after he was arrested. Had LCSD not obtained a swab on December 23, 2019, the LCSD would have swabbed for Cornish's DNA when he was processed into the detention center on December 31, 2019. This is standard for arrests in South Carolina. Therefore, we find both the inevitable discovery doctrine and independent source rule rendered the DNA admissible against Cornish.

## II. Alibi Defense

Cornish next argues the circuit court erred in refusing to charge the jury with the defense of alibi due to his claim that he remained in the truck at the time of the murders. We disagree.

"In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial." *State v. Mattison*, 388 S.C. 469, 478, 697 S.E.2d 578, 583 (2010) (quoting *State v. Adkins*, 353 S.C. 312, 318, 577 S.E.2d 460, 463 (Ct. App. 2003)). "A jury charge is correct if, when the charge is read as a whole, it contains the correct definition and adequately covers the law." *Id.* (quoting *Adkins*, 353 S.C. at 318, 577 S.E.2d at 464).

> A charge on the defense of alibi is not required when an accused person merely denies committing the criminal act. Alibi means elsewhere, and the charge should be given when the accused submits that he could not have performed the criminal act because he was in another place at the time of its commission.

*State v. Robbins*, 275 S.C. 373, 375, 271 S.E.2d 319, 320 (1980).  "Mere denial of one's presence at the scene of a crime does not constitute an alibi."  *State v. Diamond*, 280 S.C. 296, 297, 312 S.E.2d 550, 550 (1984).

> The literal significance of the word "alibi" is "elsewhere."  That is, "alibi" means elsewhere or in another place; therefore, for a credible alibi to exist, the defendant must be at a different place so remote or distant or under such circumstances that the defendant could not have committed the offense for which the defendant is being charged.

21 Am. Jur. 2d Criminal Law § 179 (footnotes omitted).  "In other words, by an alibi the accused attempts to prove that the accused has been at a place so distant that the accused's participation in the crime has been impossible."  *Id.*

In *Glover v. State*, our supreme court found Glover's trial counsel was not ineffective for failing to call a potential alibi witness because her testimony "merely place[d] respondent in Florida between 8:00 and 8:30 a.m. on the day the crimes occurred" when the offenses happened over eleven hours later in Williamsburg County.  318 S.C. 496, 498, 458 S.E.2d 538, 540 (1995).  Because the proposed alibi witness testified at Glover's PCR hearing that it took her only six-and-a-half hours to travel from her home in Florida to Williamsburg, this very testimony indicated Glover "had ample opportunity to travel from Florida to Williamsburg County prior to the time the crimes occurred."  *Id.* at 498 n.1, 458 S.E.2d at 540 n.1.; *see also Robbins,* 275 S.C. at 375, 271 S.E.2d at 320 (explaining that "since an alibi derives its potency as a defense from the fact that it involves the physical impossibility of the accused's guilt, a purported alibi which leaves it possible for the accused to be guilty is no alibi at all").

Cornish argues he was entitled to an alibi instruction based on his claim that he stayed in the truck on the day of the murders and had no knowledge of the crimes being committed inside the apartment.  He asserts his mere presence in the Woodland Village parking lot does not establish he participated in the murders, and further argues the State is required to disprove an alibi.  The circuit court found Cornish did not establish an alibi defense because his own statement to law enforcement placed him at the crime scene, and he had not demonstrated a physical impossibility of guilt.

We agree with the circuit court that the cited evidence does not indicate that it would have been impossible for Cornish to have been with Hopkins in the apartment at the time of the murders; in fact, it suggests the opposite. Indeed, Cornish's own phone records contradict his alibi claim. These records include an outgoing call at 9:45 a.m. to Peterson and a call at 9:51 from another contact. At 10:35 a.m., Cornish missed a call from the same contact. The next activity on the phone was an incoming call from Peterson at 11:16 a.m. The circuit court properly declined to give the requested alibi instruction because Cornish's claim that he remained in the truck does not suggest it was impossible (or even unlikely) that he was in the apartment at the time of the burglary and murders.

**Conclusion**

Based on the foregoing, Cornish's convictions and sentences are

**AFFIRMED.**

**KONDUROS and VINSON, JJ., concur.**