582 S.E.2d 426

**The STATE, Petitioner,**

v.

**Randall Scott FOSTER, Respondent.**

**No. 25666.**

Supreme Court of South Carolina.

Heard April 1, 2003.
Decided June 12, 2003.

616

Attorney General Henry Dargan McMaster, Chief Deputy, Attorney General John W. McIntosh, Assistant Deputy, Attorney General Charles H. Richardson, and Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia; and Solicitor William Townes Jones, IV, of Greenwood, for Petitioner.

Deputy Chief Attorney Joseph L. Savitz, III, of South Carolina Office of Appellate Defense, of Columbia, for Respondent.

JUSTICE WALLER:

We granted the State's petition for a writ of certiorari to review the Court of Appeals' opinion in *State v. Foster*, Op. No. 2001–UP–321 (Ct.App. filed Feb. 6, 2001). We affirm.

## FACTS/PROCEDURAL BACKGROUND

Respondent Randall Scott Foster was indicted for murder and possession of a weapon during the commission of a violent crime. The victim was his wife, Marilyn, who died from a single gunshot wound to her head. At trial, the jury was instructed on self-defense, accident, involuntary manslaughter, voluntary manslaughter and murder. The jury convicted Foster of voluntary manslaughter and the weapon charge, and the trial court sentenced him to twenty years and five years, concurrent. In an unpublished decision, the Court of Appeals reversed and remanded for a new trial. *State v. Foster*, *supra.*

Foster and Marilyn lived in their Prosperity home with Marilyn's three children and Foster's daughter. On Saturday night, April 25, 1998, Foster and Marilyn went out drinking and dancing. They returned home sometime after two a.m. on April 26. Very shortly thereafter, Marilyn was fatally shot.

The testimony at trial as to exactly what transpired was conflicting. Marilyn's son, Steven, and her daughter, Michelle, both testified for the State. Steven said he was sleeping on the couch when he was awakened by Foster and Marilyn arguing. He heard Marilyn say, "Are you going to shoot me?," Foster say "yes," and the gun go off. On cross-examination, Steven was questioned about a statement he made to police on the day of the shooting that he heard Foster ask Marilyn if she was going to shoot him. Steven responded he was in shock and unsure of what he said. On redirect, the State published Steven's entire statement. According to Steven's statement, Marilyn got her gun, told Foster "to get out," and Foster asked if she was going to shoot him. Then, Foster and Marilyn "started fighting over the gun," and after Michelle walked into the room, the gun went off.

Michelle, Marilyn's oldest child at age 14, testified that she witnessed the shooting. Michelle was also awakened by the couple's argument. She followed Foster into the bedroom

where Marilyn was undressing. According to Michelle, Marilyn was by the dresser and "had the gun out." [1] Foster asked Marilyn if she was going to shoot him and then took the gun away from her. Marilyn asked "Are you going to shoot me now?" Foster replied yes, raised the gun to her head, and shot her. Michelle testified there was no scuffle over the gun.

According to Foster, who testified in his own defense, he and Marilyn enjoyed a normal evening out, drinking,[2] dancing, and socializing with friends. They began arguing during the car ride home because Marilyn was angry Foster had danced and flirted too much with their friend, Linda. After entering the house, Marilyn told him to get his daughter and leave. He said no and wanted to go to bed. Marilyn replied, "Well, I have something that will make you leave" and pulled the gun out of her drawer. Foster then said, "What are you going to do, shoot me?" Foster went over to Marilyn, grabbed the gun, and they struggled over the gun. Foster testified that he had one hand on the gun and Marilyn's hands were on his hand. He was trying to pull the gun away from her, he pulled it up, and the gun went off only inches from her head. Immediately after shooting Marilyn, Foster called 911.

The police showed up within minutes of the 911 call and apprehended Foster without incident. They bagged his hands to preserve any gunshot residue.

Various aspects of the forensic evidence were discussed at trial. The fingerprints from the gun were analyzed, but the test was inconclusive. Therefore, the SLED investigator could not say who handled the weapon. The gunshot residue tests conducted on Foster and Marilyn, however, revealed that both had gunshot residue on their hands. Marilyn had gunshot residue on the **back** of **each** of her hands, while Foster had residue on his **left palm only**. When Foster cross-

---

1. It was undisputed that the gun, a .357 Magnum revolver, belonged to Marilyn and that she kept it in her dresser drawer.

2. They each drank quite a bit of alcohol that evening. Between 9 p.m. and 2 a.m., Marilyn consumed about six Crown and sevens and a couple of apple cider shooters; Foster drank five Crown and sevens, about nine beers, and two apple shooters. The pathologist testified Marilyn's blood alcohol level was .199 percent. At approximately 7 a.m., Foster's blood alcohol level was .042 percent.

examined the pathologist, he testified that the results of the gunshot residue tests "strongly suggest" that Marilyn's hands completely covered Foster's. Moreover, the pathologist could not say who had control over the gun when it was discharged. Foster presented his own forensic expert who opined there was most probably a struggle over the weapon and that Marilyn's hands were over Foster's hand.

As the only eyewitness, the testimony of Michelle was pivotal to the State's murder case. In its opening statement, the State told the jury: "the crux of the case is what you are going to hear from Michelle." On cross-examination, Foster's counsel questioned Michelle about a statement she made to police on April 28:

Q: Your statement which you gave them is more or less the version you have given us today; is that not right?

A: Yes.

Counsel then proceeded on a line of questioning regarding Michelle's prior **inconsistent** statements to others on the day of the killing. Specifically, Michelle was asked whether she had told some family friends on the morning of the incident that she thought it was an accident. Michelle insisted she had simply said she could not believe Foster "could do anything like that." On redirect, the State presented Michelle with her police statement and she read it to herself. The State asked whether the statement differed from her testimony, and Michelle replied in the negative.

After Michelle and two other witnesses testified, the State sought to admit into evidence Michelle's written statement to police.[3] Foster objected. Initially, the objection was based on relevance. The State argued, *inter alia*, that Michelle's statement was admissible as a prior **consistent** statement. Foster's counsel further argued he did not "want to give more credibility to her statement than her verbal testimony." The

---

**3.** The statement provides, in pertinent part:

At about 2:30 a.m. I heard what sounded like something breaking so I got up to see what was going on. When I got to Mom [Marilyn] and Scott's [Foster's] bedroom, Mom had a revolver type pistol pointed at Scott. Scott said Are you going to shoot me now?, and then took the gun from my mom. Mom asked Scott Are you going to shoot me now and Scott said yes and he shot my Mom.

trial court ruled the statement was not hearsay and allowed its admission.

During Foster's defense, he presented two witnesses who both stated Michelle had said her mother's shooting was an "accident." Additionally, one of these witnesses testified Michelle had said Foster and Marilyn were fighting over the gun, and the other testified Michelle had said "it wasn't [Foster's] fault."

The jury convicted Foster of voluntary manslaughter and the weapon charge. On appeal, the Court of Appeals found the trial court erred in allowing Michelle's prior consistent statement. Finding that the error was not harmless, the Court of Appeals reversed Foster's convictions and remanded for a new trial.

## ISSUE

Did the Court of Appeals correctly reverse Foster's convictions because of the improper admission of Michelle's prior consistent statement?

## DISCUSSION

The State maintains that Foster's cross-examination question to Michelle about her prior consistent statement "opened the door" to its admission. Alternatively, the State contends that the Court of Appeals erred in finding the statement inadmissible under Rule 801(d)(1)(B), SCRE. We disagree.[4]

The admission or exclusion of evidence is within the discretion of the trial court and will not be reversed on appeal

---

4. Initially, we note the State also contends this issue was not properly preserved for appellate review. The issue here is, as it was at the trial court, the admissibility of Michelle's prior consistent statement. Contemporaneous with the State's attempt to admit the statement, Foster objected. As part of his objection, he argued that the statement would add to Michelle's credibility. The danger of erroneously admitting a prior consistent statement is its bolstering effect. Therefore, we find the issue was sufficiently preserved. E.g., State v. Byram, 326 S.C. 107, 485 S.E.2d 360 (1997) (to be preserved for appeal, an issue must be raised to and ruled on by the trial judge); see also Rule 103(a)(1), SCRE (ground of objection to the admission of evidence may be apparent from the context).

absent an abuse of that discretion. *State v. Saltz*, 346 S.C. 114, 551 S.E.2d 240 (2001). An abuse of discretion occurs when the trial court's ruling is based on an error of law. *State v. McDonald*, 343 S.C. 319, 540 S.E.2d 464 (2000).

The issue in the instant case is governed by South Carolina's Rules of Evidence, adopted in 1995. Pursuant to Rule 801, prior consistent statements of a witness are not inadmissible hearsay if:

[1] the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement;

[2] the statement is consistent with the declarant's testimony;

[3] the statement is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive; and

[4] the statement was made before the alleged fabrication, or before the alleged improper influence or motive arose.

Rule 801(d)(1)(B), SCRE; *accord Saltz, supra.*

In *Saltz*, this Court explained that Rule 801(d)(1)(B) changed the common law in South Carolina where proof of a prior consistent statement had been admissible to rehabilitate a witness who had been impeached with a prior inconsistent statement. *Saltz*, 346 S.C. at 124–25, 551 S.E.2d at 245–46; *see also State v. Fulton*, 333 S.C. 359, 509 S.E.2d 819 (Ct.App. 1998) (providing extensive discussion regarding law on prior consistent statements, both before and after the adoption of the SCRE). In contrast to South Carolina's pre-rules common law, Rule 801(d)(1)(B) now "makes a prior consistent statement admissible as **substantive** evidence." *Fulton*, 333 S.C. at 369, 509 S.E.2d at 824 (emphasis added). Therefore, evidence of a prior consistent statement is **only** permitted when the elements of Rule 801(d)(1)(B) are met. *Saltz*, 346 S.C. at 124, 551 S.E.2d at 245. Put simply, " 'a prior consistent statement offered for rehabilitation is either admissible under Rule 801(d)(1)(B) or it is not admissible at all.' " *Fulton*, 333 S.C. at 374, 509 S.E.2d at 826 (citation omitted).

The situation here is very similar to the facts of *Saltz*. In that case, a State witness, Sydney Johnston, testified she had heard the defendant say he "killed" the victim. On cross-examination, defense counsel posed questions to Sydney about

whether she had originally stated the defendant had said "I did it" and he had been saying that sarcastically. During the testimony of another witness, Jan Kopel, the State was permitted to admit testimony from Kopel of a prior consistent statement made by Sydney where Sydney stated the defendant had said he "killed" the victim. This Court held that the questioning of a witness about a prior **inconsistent** statement was insufficient to invoke Rule 801(d)(1)(B):

> The plain language of Rule 801(d)(1)(B) only permits evidence of a prior consistent statement when the witness has been charged with recent fabrication or improper motive or influence. Although questioning a witness about a prior inconsistent statement does call the witness's credibility into question, that is not the same as charging the witness with "recent fabrication" or "improper influence or motive." ...
> Appellant questioned the accuracy of the witness's memory; he did **not** charge her with recent fabrication or improper influence or motive.

*Saltz*, 346 S.C. at 124, 551 S.E.2d at 245 (emphasis in original, citation omitted).

Likewise, in the instant case, Michelle's statement was inadmissible because there was no express or implied charge against Michelle of recent fabrication or improper influence or motive. Foster's questions did not rise to the level of charging fabrication, but instead amounted to calling her credibility into question, i.e., simple impeachment.[5] Thus, because the requirements of Rule 801(d)(1)(B) were not met in the instant case, the written consistent statement was inadmissible hearsay, and the trial court erred in allowing the statement. *Id.* This error served only to **improperly** bolster Michelle's testi-

---

5. Foster's brief cross-examination of Michelle focused primarily on her prior inconsistent statements. This is markedly different from what has been deemed sufficient to trigger Rule 801(d)(1)(B)'s requirement of "an express or implied charge against the declarant of recent fabrication or improper influence or motive." *See Saltz*, 346 S.C. at 124–27, 551 S.E.2d at 246–47 (finding that the State's questions of a defense witness regarding her coming forward 13 days before trial and her romantic relationship with the defendant charged the witness with both fabrication and improper motive); *State v. Jeffcoat*, 350 S.C. 392, 397, 565 S.E.2d 321, 324 (Ct.App.2002) (finding that defense counsel raised the issue of improper influence by asking the victim whether she "practiced" before testifying and whether anyone had told her what to say).

mony.  *See Tome v. United States,* 513 U.S. 150, 157–58, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995) (discussing federal [6] Rule 801(d)(1)(B) and stating that the purpose of the rule is to rebut an alleged fabrication or motive, not to "bolster[ ] the veracity of the story told.").

We reject the State's contention that Foster "opened the door" to the prior consistent statement.  The State asserts that because Foster asked Michelle a single, non-substantive question about her prior consistent statement, and then questioned Michelle's veracity by asking about her prior inconsistent statements, the State was allowed to admit the statement in its entirety as substantive evidence.  However, this so-called "fairness" argument amounts to an argument that may have been proper under pre-SCRE law, but is simply not tenable under Rule 801(d)(1)(B).  *See Saltz, supra* (evidence of a prior consistent statement is **only** permitted when Rule 801(d)(1)(B) is satisfied); *Fulton, supra* (same).

Furthermore, the instant case is distinguishable from other cases where we have found that defense counsel contributed to the error by opening the door to otherwise arguably impermissible evidence.  *See, e.g., State v. Robinson,* 305 S.C. 469, 409 S.E.2d 404 (1991); *State v. Stroman,* 281 S.C. 508, 316 S.E.2d 395 (1984); *State v. Sullivan,* 277 S.C. 35, 282 S.E.2d 838 (1981).  "[W]hen a party introduces evidence about a particular matter, the other party is entitled to explain it or rebut it, even if the latter evidence would have been incompetent or irrelevant had it been offered initially."  *State v. Beam,* 336 S.C. 45, 52, 518 S.E.2d 297, 301 (Ct.App.1999); *see also State v. Dunlap,* 353 S.C. 539, 579 S.E.2d 318 (2003) (finding that evidence of prior drug convictions was properly allowed to rebut false impression made by counsel in opening statement).  However, counsel here merely asked whether Michelle had given police a statement consistent with her testimony on direct examination.  Allowing the State to then admit the written statement did not rebut or explain this testimony in any way.  Instead, the **sole** purpose the State had for admitting Michelle's prior **consistent** statement was to

---

**6.** "Rule 801(d)(1)(B), SCRE is based upon its counterpart under the Federal Rules of Evidence." *Fulton,* 333 S.C. at 370, 509 S.E.2d at 824; *see also* Note to Rule 801, SCRE.

rehabilitate its witness and bolster her credibility which was called into question by the cross-examination on her prior **inconsistent** statements. This is forbidden unless the requirements of Rule 801(d)(1)(B) are met.

Accordingly, we find the Court of Appeals' correctly held the trial court erred by admitting the prior consistent statement, and thus abused its discretion. *Saltz, supra; Mc-Donald, supra.*

The State argues that any error was harmless beyond a reasonable doubt because it was merely cumulative. We disagree.

As we stated in *Saltz:* "[e]rroneously admitted corroboration testimony is not harmless merely because it is cumulative. On the contrary, 'it is precisely this cumulative effect which enhances the devastating impact of improper corroboration.'" *Saltz,* 346 S.C. at 124, 551 S.E.2d at 246 (citation omitted).

In its harmless error analysis, the Court of Appeals stated the following:

[Michelle's] credibility was of paramount importance; her testimony that Foster shot her mother at point blank range after he "snatched" the gun away was the crucial evidence offered by the State of an intentional shooting.... Moreover, far from being overwhelming, the evidence of guilt was highly equivocal.

We agree with the Court of Appeals. In its opening statement, the State acknowledged Michelle's testimony would be "the crux" of its case. Indeed, the evidence of an intentional shooting was based almost exclusively on Michelle's testimony, with some partial corroboration by her brother, Steven. The defense showed, however, that both Michelle and Steven had made prior statements inconsistent with their trial testimony **and** corroborative of Foster's version of the incident. Additionally, the forensic evidence certainly supported Foster's account. Thus, we hold the admission of Michelle's prior consistent statement, which clearly bolstered her crucial trial testimony, could not be considered harmless error. *Saltz, supra.*

## CONCLUSION

For the foregoing reasons, the Court of Appeals' opinion is **AFFIRMED.**

BURNETT and PLEICONES, JJ., concur. MOORE, J., dissenting in a separate opinion in which TOAL, C.J., concurs.

### JUSTICE MOORE DISSENTING:

I agree with the majority that counsel's cross-examination of Michelle regarding allegedly inconsistent statements did not rise to the level of charging recent fabrication or improper motive, and therefore her prior consistent statement was not admissible under Rule 801(d)(1)(B). *State v. Saltz*, 346 S.C. 114, 551 S.E.2d 240 (2001). I part company with the majority, however, in its rejection of the State's argument that counsel "opened the door" to the admission of Michelle's statement.

In context, counsel questioned Michelle as follows:

Q: What day did you talk with Tammy Shealy and Todd Johnson, do you remember?

A: Not at all.

Q: Was it several days later?

A: I think it was the 28th.

Q: So that would be Tuesday.

A: Yeah.

Q: Your statement which you gave them is more or less the version you have given us today; is that not correct?

A: Yes.

Q: Michelle, this is quite important. I have got a question to ask you now. Did you ever give anybody any other statements regarding this incident that differ from the version you gave Mr. Johnson and Mrs. Shealy?

A: No.

Counsel then questioned Michelle regarding "conversations with anybody on Sunday morning or Sunday afternoon" wherein she stated her mother's killing was an accident.

In asking Michelle whether her statement to police was "more or less the version you have given us today" and whether her statement to police differed from her earlier

conversations, counsel raised the issue of the statement's content. Since the defense raised the issue of Michelle's statement to police, it was only fair to allow the State to put the statement into evidence so the jury could evaluate the statement's content for itself. *See State v. Robinson*, 305 S.C. 469, 409 S.E.2d 404 (1991) (one who opens the door to evidence cannot complain of its admission).

I disagree that *Saltz* prohibits the admission of Michelle's statement under an "opening the door" analysis. As stated in *Saltz*, the precise issue in that case was "whether questioning the witness concerning a prior *in* consistent statement invokes Rule 801(d)(1)(B)." 346 S.C. at 123, 551 S.E.2d at 245 (emphasis in original). *Saltz* holds examination regarding inconsistent statements does not amount to a charge of fabrication to justify admission of a consistent statement under that rule. Here, counsel directly questioned the witness about the consistent statement itself, an issue not before the Court in *Saltz*.

Because counsel opened the door to the admission of Michelle's statement, I would reverse the Court of Appeals and reinstate Foster's conviction. Accordingly, I respectfully dissent.

TOAL, C.J., concurs.