597 S.E.2d 169

**The STATE, Respondent,**

**v.**

**Willie Earl REESE, Jr., Appellant.**

**No. 3790.**

Court of Appeals of South Carolina.

Heard April 7, 2004.
Decided May 3, 2004.
Rehearing Denied June 25, 2004.

Jack B. Swerling, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General William Edgar Salter, III, and Solicitor Warren Blair Giese, all of Columbia, for Respondent.

ANDERSON, J.:

Appellant Willie Earl Reese, Jr. was indicted and charged with the murder of his wife Teresa. Following a jury trial, he was found guilty and sentenced to thirty-five years in prison. He now appeals, asserting the trial court erred in the admission of hearsay testimony, the admission of photographs of the victim's body and autopsy, denying certain requested jury charges, and failing to grant a mistrial based on the Solicitor's closing arguments. We reverse and remand.

## FACTUAL/PROCEDURAL BACKGROUND

Following her marriage to Reese in January 1999, Teresa Joyner moved out of the marital house and returned to her parents' home on two occasions, the first in January 2001 and again in April of the same year. Late in the evening during her second stay away from the marital home, as Teresa stood

on the sidewalk in front of her parents' house, Reese shot Teresa in the head, killing her.

During the evening leading up to the fatal shooting, Teresa had been playing softball with her neighbor and cousin, Edith McKenzie. After the game, the two went to a club. Throughout the evening, while Teresa was with Edith, Teresa's mother received repeated telephone calls from Reese inquiring about Teresa's whereabouts and asking that she call him when she returned home. Each time he called, Teresa's mother assured Reese that she would tell her daughter he had called.

Edith testified that after leaving the club with Teresa around 1:30 a.m., she noticed Reese's car parked at a stop sign as she pulled into Sandstone Lane. Pulling alongside his car, Teresa spoke briefly with Reese, after which he turned his car around and followed Teresa to her parents' house. Standing in front of her parents' house, Teresa assured Edith that everything was okay, gave her a hug, and told her that she would see her tomorrow. Edith then departed, leaving Teresa and Reese standing on the sidewalk facing each other.

Edith drove to her own home two houses away, and once inside, called to check on Teresa. Teresa's mother answered the phone, and Edith asked if Teresa had come inside. According to Edith's testimony, when Teresa's mother went outside to check, she began screaming. Edith then drove back to where she had left Teresa and found her body on the sidewalk.

The following day, using his father as an intermediary, Reese contacted the police and informed them he wanted to turn himself in. Deputy Thomas Reese, the officer who took Reese into custody, testified that Reese was upset, at times crying, and cooperative throughout the process. At the sheriff's office, Reese gave the following voluntary written statement:

> I didn't go there to kill my wife. I went to talk to her. When she pulled up she said to follow her to the house, so I did. We were right there on the sidewalk talking. I said hello to [Edith] and she drove home. We talked for a few minutes. I was upset and crying. I pulled the gun out and told her that I was going to kill myself. She was trying to tell me not to kill myself. I kept asking, "Why does it got

to be like this, baby?" I was moving the gun back and forth as a reaction. I don't know why the gun went off. I thought both safeties were on. I just wanted to see how she would react when I told her I was going to kill myself. I didn't mean to shoot her.

When the gun went off I put my hands on my head. I panicked. I went to my car and put the gun to my head. I decided to call my dad. He talked me out of killing myself. I went to my aunt's house and parked the car. I walked to my dad's house. He told me to please put the gun down. I ended up putting the gun in the tire in the boat in the backyard where I told you all it was and it's the same one you recovered. My sister had called Tasha to bring the kids over because I was thinking about killing myself. My dad calmed me down and rode me around. Then I turned myself in over at Deputy Reese's house where you picked me up.

At trial, three witnesses testified that Teresa had moved out because of marital difficulties she was having with Reese. On each occasion, counsel for Reese objected that the portion of the testimony relating to why she moved out was hearsay because they "could only know that through hearsay." The objections were overruled. Over Reese's objection, four of the State's witnesses testified that during the week prior to her shooting, Teresa had told them that she was afraid for her life. Over objection, the State admitted into evidence Exhibit 13, a photograph of Teresa's body at the scene, and Exhibit 19, an autopsy photo.

At the close of the State's evidence, counsel for Reese requested that the jury be instructed on the law of involuntary manslaughter and accident. The State objected, arguing that the felony of pointing and presenting a firearm was involved, thereby leaving Reese ineligible for jury instructions on involuntary manslaughter and accident. Whether or not the felony was implicated, counsel for Reese responded, the evidence did not necessarily establish the elements of the crime and "the jury could conclude that he was not pointing or presenting." The trial court sustained the State's objection, ruling that Reese was not entitled to involuntary manslaughter and accident charges.

At the beginning of his closing argument, the Solicitor noted the presence of counsel for Reese and explained his role as an advocate. He then asked the jury, "Who speaks for Teresa Reese? In this system of justice that we have in this type of case who speaks for Teresa Reese? That is the question that has been asked since April 29th, I submit to you, of this year, since the day she died." The Solicitor reiterated the question, "Madam Forelady and Gentlemen, the question is: Who speaks for Teresa Reese? And I submit to that that question can be answered and will be answered today." The Solicitor argued:

> After you have seen all of the evidence—you notice I didn't answer the question before I went over the evidence with you. I have now gone over all of the evidence with you. And this is argument. And you have seen all of the evidence of malice that the State submits to you we have proven. So now I ask you, now that all the evidence is in upon my argument, who speaks for Teresa Reese? You do, Madam Forelady and Ladies and Gentlemen of the jury.

The Solicitor then concluded, "You can speak for her with your verdict. Because the truth is that she was murdered. The facts are there and you're going to hear the law. And so you, the State submits, will speak for her with your verdict, with your verdict."

Counsel for Reese twice objected to the Solicitor's closing argument and moved for a mistrial. The trial judge denied Reese's motion, explaining, "All right, sir. It may be close, but I'll overrule your motion Mr. Swerling." When counsel for Reese requested a curative instruction, the trial judge responded, "I've already ruled. I overruled his objection. I can't very well give a curative instruction if I were to believe that your final argument was beyond the bounds of what is allowed by law."

## *LAW/ANALYSIS*

## I.  SOLICITOR'S CLOSING ARGUMENT

■ The following colloquy occurred during the Solicitor's closing argument:

> MR. GASSER: Who speaks for Teresa Reese? In this system of justice that we have in this type of case, who

speaks for Teresa Reese? That is the question that has been asked since April the 29th, I submit to you, of this year, since the day she died.

From the time that Willie Earl Reese was arrested, the time that he initially appeared in court, through the Grand Jury proceedings, when he was placed on the trial docket, when his case was called on Monday, when you jurors with your fellow jurors assembled downstairs before Judge Manning, during the process of you being selected for this case, from opening statements of Ms. Campbell and Mr. Swerling through the presentation of the testimony and the submission of evidence, through the closing remarks of Ms. Campbell and Mr. Swerling and as I stand before you, Madam Forelady and Ladies and Gentlemen, the question is: Who speaks for Teresa Reese? And I submit to you that that question can be answered and will be answered today.

. . . .

Ms. Campbell told you, the last line of her opening statement Ms. Campbell told you that this case is about holding Willie Reese, Jr. responsible for the choices he made on April the 29th. So I ask you again: Who speaks for Teresa Reese?

MR. SWERLING: Judge, I have to object. I don't like to do it, but I have to object to this line of argument. I don't think it's proper and I'd like to make a motion on it. I can either do it after Mr. Gasser is done.

THE COURT: Yes, sir.

MR. SWERLING: But it is closing argument. But I object to this line of argument.

THE COURT: All right, sir.

MR. SWERLING: I have a motion.

THE COURT: Overruled. Go ahead.

MR. GASSER: Thank you, Your Honor. After you have seen all of the evidence—you notice I didn't answer that question before I went over the evidence with you. I have now gone over all of the evidence with you. And this is argument. And you have seen all of the evidence of malice that the State submits to you we have proven. So now I ask you, now that all the evidence is in upon my argument,

who speaks for Teresa Reese? You do, Madam Forelady and Ladies and Gentlemen of the Jury.

MR. SWERLING: Again, Your Honor, for the same reasons.

MR. GASSER: You do. You speak for her.

MR. SWERLING: I'd like to be heard on that issue.

THE COURT: Yes, sir. I'll hear you.

MR. GASSER: You can speak for her with your verdict. Because the truth is that she was murdered. The facts are there, and you're going to hear the law. And so you, the State submits, will speak for her with your verdict, with your verdict.

She had the right to leave him and she had the right to not be afraid. She had the right to live. That was her choice. Willie Earl Reese's choice that morning, he chose death. Now, you can't do anything about that. But when your verdict speaks the truth when you convict him of murder, it will be justice. And justice, Madam Forelady, and Ladies and Gentlemen, justice is what each and every one of you represent here today.

After the Solicitor's closing argument, the judge charged the jury. Once the jury retired to the jury room, the judge heard Mr. Swerling's motion:

THE COURT: Mr. Swerling, I'll hear your motion first.

MR. SWERLING: Yes, sir. During the argument I objected twice to Mr. Gasser's statements to the jury reluctantly. But I think that those kind of remarks exceed the bounds of permissible argument. The jury's responsibility is to speak the truth, to render a verdict on the law and the evidence, not to speak for the victim in the case. They're not supposed to speak for anyone except to speak the truth.

Mr. Gasser personalized the issue to the jury by suggesting they were speaking for Ms. Joyner, made their responsibility personal rather than as a jury to decide the issue from the facts and evidence and injected I think into the trial and to the jury an inflammation and a passion to decide this case for some other reason other than the facts and the law. So, based on it, Judge, I object and I move for a mistrial.

THE COURT: Mr. Gasser.

MR. GASSER: Your Honor, I couched it. That's why I didn't answer that question. Mr. Swerling is the one who told the jury that we were advocates and we were arguing a position and that—I had specifically waited to the end of my argument after I'd gone over all of the evidence. And I was arguing them, which I am entitled to, that the evidence clearly shows that he's guilty and I'm asking them for a verdict of guilt, and I'm merely telling them when they—our position is when they—the evidence is that he is guilty and when they sign—they'll all vote guilty which we're asking them to do because we are advocates, Mr. Swerling is asking them to find him not guilty, that when they all agree that he is guilty that their agreement and then the forelady's signature speaks on behalf of Ms. Reese. But I waited to do that towards the end. It was an argument that I've seen made on numerous occasions and that I've made before.

THE COURT: All right, sir. It may be close, but I'll overrule your motion, Mr. Swerling.

MR. SWERLING: Yes, sir.

. . . .

MR. SWERLING: Would you issue at least a curative instruction to the jury they are to disregard those remarks by Mr. Gasser?

MR. GASSER: Your Honor, I don't understand why one side can passionately argue a position and why the other side can't. I don't know how many times he used the word Mr. Reese, Mr. Reese and Willie Reese, and developed the principles and foundations of the Constitution, which is permissible, just as what I have done.

THE COURT: I've already ruled. I overruled his objection. I can't very well give a curative instruction if I were to believe that your final argument was beyond the bounds of what is allowed by the law.

. . . .

MR. SWERLING: Yes, sir.

■ A review of a solicitor's closing argument is based upon the standard of whether his comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *State v. Caldwell,* 300 S.C. 494, 504, 388

S.E.2d 816, 822 (1990). The appropriateness of a solicitor's closing argument is a matter left to the trial court's discretion. *State v. Rudd,* 355 S.C. 543, 548, 586 S.E.2d 153, 156 (Ct.App. 2003); *State v. King,* 349 S.C. 142, 160, 561 S.E.2d 640, 649 (Ct.App.2002); *State v. Sweet,* 342 S.C. 342, 347, 536 S.E.2d 91, 93 (Ct.App.2000). A trial judge is allowed broad discretion in dealing with the range and propriety of closing arguments to the jury. *State v. Raffaldt,* 318 S.C. 110, 114–15, 456 S.E.2d 390, 393 (1995); *State v. Bell,* 302 S.C. 18, 33, 393 S.E.2d 364, 372 (1990); *State v. Woomer,* 278 S.C. 468, 474, 299 S.E.2d 317, 320 (1982). An appellate court will not disturb a trial court's ruling regarding closing argument unless there is an abuse of discretion. *State v. Copeland,* 321 S.C. 318, 324, 468 S.E.2d 620, 624 (1996); *State v. Jernigan,* 156 S.C. 509, 524, 153 S.E. 480, 486 (1930). An abuse of discretion occurs when the trial court's ruling is based on an error of law. *State v. Foster,* 354 S.C. 614, 621, 582 S.E.2d 426, 429 (Ct.App.2003); *State v. McDonald,* 343 S.C. 319, 325, 540 S.E.2d 464, 467 (2000); *State v. Adams,* 354 S.C. 361, 378, 580 S.E.2d 785, 793–94 (Ct.App.2003). To warrant reversal, the appellant must prove both abuse of discretion and resulting prejudice. *State v. Sierra,* 337 S.C. 368, 373, 523 S.E.2d 187, 189 (Ct.App. 1999).

■ "A solicitor's closing argument must not appeal to the personal biases of the jurors nor be calculated to arouse the jurors' passions or prejudices, and its content should stay within the record and reasonable inferences to it." *Humphries v. State,* 351 S.C. 362, 373, 570 S.E.2d 160, 166 (2002); accord *Simmons v. State,* 331 S.C. 333, 338, 503 S.E.2d 164, 166 (1998); *see also State v. Cooper,* 334 S.C. 540, 553, 514 S.E.2d 584, 591 (1999) ("A solicitor's closing argument must be carefully tailored so it does not appeal to the personal biases of the jurors."); *State v. Linder,* 276 S.C. 304, 312, 278 S.E.2d 335, 339 (1981) (holding that because the solicitor's duty is not to convict the defendant but to see justice done, the solicitor's closing argument must be "carefully tailored" to not appeal to personal bias of juror nor calculated to arouse his passion or prejudice"); *State v. Rudd,* 355 S.C. 543, 548, 586 S.E.2d 153, 156 (Ct.App.2003) ("A solicitor's closing argument must be carefully tailored so it does not appeal to the personal biases of the jurors.").

■ Specifically, the solicitor asking the jurors to put themselves in the place of the victim is improper and constitutes reversible error. *State v. McDaniel,* 320 S.C. 33, 38, 462 S.E.2d 882, 884 (Ct.App.1995). This is known as the Golden Rule Argument. The Golden Rule Argument "ask[s] the jurors to become advocates for the plaintiff or victim and to ignore their obligation to exercise calm and reasonable judgment." Black's Law Dictionary 700 (7th ed.1999); see also John W. Reis, *Improper Jury Argument: Gilding the Lustre of the Golden Rule,* 69–JAN Fla. B.J. 60, 60 (1995) ("The traditional notion of the Golden Rule, though not contained in any rule of evidence or procedure, holds that a lawyer shall not urge the jury members, either in a civil or criminal case, to imagine themselves or their family members or friends in the place of the offended litigant or victim and to render their verdict from that perspective."). Although the forbiddance of Golden Rule Arguments began in civil trials to hinder the plaintiff from urging the jury to put itself in the place of the victim in order to obtain higher damages, the prohibition has now been made applicable to criminal actions. 75A Am.Jur.2d *Trial* § 650 (1991); *see Lucas v. State,* 335 So.2d 566, 568 (Fla.Dist.Ct.App.1976) (holding that "[t]he technique of asking jurors to place themselves in the position of the victim has been held to be improper in both criminal and civil cases").

■ "The 'Golden Rule' argument, suggesting to jurors as it does that they put themselves in the shoes of one of the parties, is generally impermissible because it encourages the jurors to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." 75A Am.Jur.2d Trial § 650 (1991). Regardless of the nomenclature used, any argument that importunes the jurors to places themselves in the victim's shoes is disallowed Golden Rule Argument. *Johnson v. State,* 263 Ga.App. 443, 587 S.E.2d 775, 781 (2003).

■ Golden Rule Arguments are generally improper and may constitute reversible error. *State v. McHenry,* 276 Kan. 513, 78 P.3d 403, 410 (2003); *see also State v. Prevatte,* 356 N.C. 178, 570 S.E.2d 440, 476 (N.C.2002) ("Arguments that ask the jurors to place themselves in the victim's shoes are improper."); *Velocity Express Mid–Atlantic, Inc. v. Hugen,*

266 Va. 188, 585 S.E.2d 557, 565 (2003) (ruling "plaintiff's repeated requests to the jury that it apply the 'Golden Rule' were prejudicial and constitute[d] reversible error").

During the Solicitor's closing arguments, Mr. Swerling immediately objected once the Solicitor posed the question to the jury, "Who speaks for Teresa Reese?" The judge overruled the motion. After the Solicitor's closing remarks included "[w]ho speaks for Teresa Reese? You do, Madam Forelady and Ladies and Gentlemen of the Jury," Mr. Swerling again objected. The court heard Mr. Swerling's motion after the judge charged the jury and they were in the jury room. Mr. Swerling initially moved for a mistrial based upon the passion-invoked closing argument. The judge overruled his motion. Mr. Swerling then asked the judge for a curative instruction to the jury to disregard the remarks made by the Solicitor. The judge denied the motion by stating, "I've already ruled."

Although a judge is given wide discretion in regard to closing arguments, the judge irrefutably abused his discretion when he allowed the Solicitor to continue the argument in his closing statement that aroused the passions or prejudices of the jury. This was impermissible Golden Rule Argument that asked the jurors to become advocates for the victim by speaking for her instead of maintaining their neutral role as jurors. Because the judge did not give a curative instruction after Mr. Swerling requested it, the trial judge's abuse of discretion resulted in prejudice to Reese. We rule the improper jury argument was prejudicial requiring a reversal of the jury verdict.

## II. INVOLUNTARY MANSLAUGHTER CHARGE

██ The Solicitor published the following **STATEMENT** that Reese gave to Sergeant Barnes:

> I didn't go there to kill my wife. I went there to talk to her. When she pulled up she said to follow her to the house, so I did. We were right there on the sidewalk talking. I said hello to Nel and she drove home. We talked for a few minutes. I was upset and crying. I pulled the gun out and told her I was going to kill myself. She was trying to tell me not to kill myself. I kept asking, "why does it got to be like this, baby?" **I WAS MOVING THE GUN BACK AND**

FORTH AS A REACTION. I DON'T KNOW WHY THE GUN WENT OFF. I THOUGHT BOTH SAFETIES WERE ON. I JUST WANTED TO SEE HOW SHE WOULD REACT WHEN I TOLD HER I WAS GOING TO KILL MYSELF. I DIDN'T MEAN TO SHOOT HER. WHEN THE GUN WENT OFF I PUT MY HANDS ON MY HEAD. I PANICKED. (Emphasis added).

▪ The law to be charged must be determined from the evidence presented at trial. *State v. Knoten*, 347 S.C. 296, 302, 555 S.E.2d 391, 394 (2001); *State v. Cole*, 338 S.C. 97, 101, 525 S.E.2d 511, 512 (2000). *"The trial judge is to charge the jury on a lesser included offense if there is any evidence from which it could be inferred the lesser, rather than the greater, offense was committed."* *State v. Gourdine*, 322 S.C. 396, 398, 472 S.E.2d 241, 241 (1996) (emphasis added); *see State v. Norris*, 253 S.C. 31, 35, 168 S.E.2d 564, 565 (1969) (finding "that to warrant the court in eliminating the offense of manslaughter it should very clearly appear that there is no evidence whatever tending to reduce the crime from murder to manslaughter"); *State v. Chatman*, 336 S.C. 149, 151, 519 S.E.2d 100, 101 (1999). "To warrant reversal, a trial judge's refusal to give a requested jury charge must be both erroneous and prejudicial." *State v. Hughey*, 339 S.C. 439, 450, 529 S.E.2d 721, 727 (2000); *see State v. Harrison*, 343 S.C. 165, 172, 539 S.E.2d 71, 74 (Ct.App.2000) ("A trial court commits reversible error if it fails to give a requested charge on an issue raised by the evidence."); *State v. Hill*, 315 S.C. 260, 262, 433 S.E.2d 848, 849 (1993) (finding a trial court commits reversible error if it fails to give a requested charge on an issue raised by the evidence).

▪ Involuntary manslaughter is (1) the unintentional killing of another without malice, but while engaged in an unlawful activity not naturally tending to cause death or great bodily harm; or (2) the unintentional killing of another without malice, while engaged in a lawful activity with reckless disregard for the safety of others. *State v. Tyler*, 348 S.C. 526, 529, 560 S.E.2d 888, 889 (2002); *State v. Chatman*, 336 S.C. 149, 519 S.E.2d 100 (1999). For an involuntary manslaughter charge to stand, the accompanying unlawful act must not be a felony nor naturally tend to cause death or great bodily harm.

*State v. Avery,* 333 S.C. 284, 509 S.E.2d 476 (1998). A person who points and presents a loaded or unloaded firearm at another is guilty of a felony. S.C.Code Ann. § 16–23–410 (2003). The unlawful carrying of a pistol is a misdemeanor. S.C.Code Ann. § 16–1–100(C) and § 16–23–20 (2003). The negligent handling of a loaded gun will support a finding for involuntary manslaughter. *State v. Burriss,* 334 S.C. 256, 265, 513 S.E.2d 104, 109 (1999); *State v. White,* 253 S.C. 475, 478, 171 S.E.2d 712, 714 (1969).

In *State v. Crosby,* the South Carolina Supreme Court held that the evidence presented at trial warranted a jury instruction on involuntary manslaughter. The court explained:

A defendant is, however, entitled to a charge on involuntary manslaughter where the evidence shows a reckless disregard of the safety of others. (citation omitted)

. . . .

The law to be charged must be determined from the evidence presented at trial. *State v. Cole,* 338 S.C. 97, 525 S.E.2d 511 (2000). A trial court should refuse to charge a lesser-included offense only where there is no evidence the defendant committed the lesser rather than the greater offense. Involuntary manslaughter is (1) the unintentional killing of another without malice, but while engaged in an unlawful activity not naturally tending to cause death or great bodily harm; or (2) the unintentional killing of another without malice, while engaged in a lawful activity with reckless disregard for the safety of others. *State v. Chatman,* 336 S.C. 149, 519 S.E.2d 100 (1999). To constitute involuntary manslaughter, there must be a finding of criminal negligence, statutorily defined as a reckless disregard of the safety of others. *Casey v. State,* 305 S.C. 445, 409 S.E.2d 391 (1991); S.C.Code Ann. § 16–3–60 (1985). In *State v. Burriss,* 334 S.C. 256, 513 S.E.2d 104 (1999), this Court held that a person can be acting lawfully, even if he is in unlawful possession of a weapon, if he was entitled to arm himself in self-defense at the time of the shooting. In Burriss, the defendant was threatened and then attacked by the victim and another male. After being pushed to the ground, the defendant drew a gun and fired two rounds into the ground. One attacker backed away, but urged his accomplice—the victim—to attack the defendant again. At

this point, the defendant was on the ground, separated from his gun. When the victim began moving threateningly toward Burriss, he snatched his gun up and it fired. Burriss stated he was scared and his hand was shaking when the gun went off: "It was an accident. I didn't try to shoot nobody." *Burriss,* 334 S.C. at 263, 513 S.E.2d at 108. At one point, however, Burriss also testified that "my hand was on the trigger. The trigger was pulled or whatever."

. . . .

... *In his statement* to police immediately after the shooting, Crosby stated, "I closed my eyes and pulled the trigger. I didn't even know I pulled the trigger. I was scared. I seen my life in danger. I didn't know how to react."

In our view, the only evidence which appears to directly support the Court of Appeals' ruling is *Crosby's statement* to police in which he stated he closed his eyes and pulled the trigger. *However, this ignores the fact that Crosby immediately added that he didn't even know he had pulled the trigger. The effect of the Court of Appeals' holding is that if there is any evidence a shooting was intentional, all evidence from which any other inference is may be drawn is negated. This is not the law of this state.* State v. Hill, 315 S.C. 260, 433 S.E.2d 848 (1993) (charge must be given if there is any evidence to support it; trial court commits reversible error if it fails to give a requested charge on an issue raised by the evidence). We hold Crosby was entitled to a jury charge on the law of involuntary manslaughter.

355 S.C. 47, 51–53, 584 S.E.2d 110, 111–113 (2003) (emphasis in original and emphasis added).

Additionally, *Knoten* is instructive in this case. The State argued that because Knoten retracted his confession at trial, the trial court correctly refused to charge voluntary manslaughter. The court held that because the confession was introduced at trial, it would support a charge on voluntary manslaughter regardless of the fact that the defendant withdrew this confession:

In support of its second argument, that because Appellant recanted *his statement* he was properly denied the requested voluntary manslaughter charge, the State cites a single

case, *State v. Weaver,* 265 S.C. 130, 217 S.E.2d 31 (1975). In that case, the Court held there was no error in denying the defendant's request to charge that if the jury found the arresting officer used unreasonable force in effecting the arrest, the defendant's resistance would not have been unlawful. At trial, the defendant denied that he resisted arrest. The officer testified that he did not use unreasonable force in effecting the arrest. The defendant had made no pre-trial statement which would have supported the requested charge. The record contained no evidence that the officer used unreasonable force, and therefore the requested charge was not warranted. *See State v. Cole, supra. Weaver* is distinguishable from the instant case. Moreover, the State's argument does not accurately reflect the law of this State. In *State v. Moore,* 245 S.C. 416, 140 S.E.2d 779 (1965), the defendant was charged with, and convicted of, assault and battery of a high and aggravated nature. The trial court refused his requested jury charge on simple assault and battery, despite testimony that the victim had received only slight injuries. The defendant testified that he had been elsewhere when the incident occurred, and under the defense's theory, he could have been not guilty of even simple assault and battery. The Court held that the refusal to charge on the lesser included offense was reversible error. The Court stated that,

In determining the issues to be submitted to the jury . . . ***all of the testimony, both for the State and the defense,*** must be considered. . . . The fact that the defendant interposed the defense of alibi did not deprive him of the benefit of the reasonable inferences to be drawn from the testimony relative to the degree of the offense committed, for the burden of establishing the offense charged rested upon the State.

*Id.* at 420–21, 140 S.E.2d at 781.

Because there was evidence—***in this case introduced by the State***—supporting a conviction for the lesser included offense of voluntary manslaughter, we reverse Appellant's conviction in the slaying of Kimberly Brown.

347 S.C. 296, 308–09, 555 S.E.2d 391, 397–98 (emphasis added).

The efficacy of Knoten is that when the State introduces a statement or confession, that statement or confession *may* support an involuntary manslaughter charge.

Evidence must exist that the killing was unintentional and without malice, in addition to either an unlawful activity not naturally tending to cause death or great bodily harm or a lawful activity with reckless disregard for the safety of others. The State introduced **Reese's statement** where the jury could infer Reese's intent was to threaten to kill himself and he did not point or present the gun to her; thereby finding the shooting of the gun was unintentional. Reese stated:

> I pulled the gun out and told her I was going to kill myself.... I was moving the gun back and forth as a reaction. I don't know why the gun went off. I thought both safeties were on. I just wanted to see how she would react when I told her I was going to kill myself. I didn't mean to shoot her. When the gun went off I put my hands on my head. I panicked.

Accordingly, evidence does exist in the record that would allow the jury to infer the lesser-included offense of involuntary manslaughter was committed. The trial judge committed reversible error by failing to charge the jury on involuntary manslaughter, which resulted in prejudice to the Reese.[1]

**REVERSED AND REMANDED.**

BEATTY, J., concurs.

HEARN, C.J., dissents in a separate opinion.

HEARN, C.J.

In my view, even if the jury believed Reese's statement that he shot his wife accidentally, he was not entitled to an involuntary manslaughter or accident charge because the shooting occurred while Reese was engaged in the felony of pointing or presenting a firearm. Further, although I agree the trial judge erred by allowing the solicitor to urge jurors to speak for the victim, I believe the error was harmless. Thus, I respectfully dissent.

---

1. In view of our reversal of the case on the identified issues, we decline to address any other arguments.

## I. Involuntary Manslaughter and Accident Charge

If there were any evidence from which it could be inferred that Reese committed involuntary manslaughter, Reese would undoubtedly be entitled to receive a jury charge on that lesser-included offense. *See State v. Gourdine,* 322 S.C. 396, 398, 472 S.E.2d 241, 241 (1996) ("The trial judge is to charge the jury on a lesser included offense if there is any evidence from which it could be inferred the lesser, rather than the greater, offense was committed."). Likewise, a charge on accident would be warranted if any evidence suggested that the victim's death resulted from an accidental shooting. However, I believe no such inferences can be drawn based on the record before me.

It is undisputed that Reese and the victim were separated at the time of the shooting, and the victim was living with her parents. The evening before the shooting, the State introduced phone records showing that Reese had called the victim's cell phone fifty-one times between 9:45 p.m. and 2:00 a.m. When the victim was returning home during the early morning hours on the day of the shooting, Reese was waiting for her at a stop sign in front of her parents' street. The two drove separately to the home of the victim's parents, and they talked outside. As the majority opinion quoted, Reese made a statement to the police claiming that while they were talking, he "pulled the gun out" and did not "know why the gun went off" when he was "moving it back and forth." Importantly, Reese never denied pointing the gun at the victim. Rather, he stated that he was surprised by the shooting because "he thought both safeties were on." Moreover, in addition to Reese's admission that he was waving the gun back and forth, numerous witnesses testified (and the tragic result makes clear) that the gun was pointed in the victim's direction. In fact, the crime scene investigator, the deputy coroner, and a forensic pathologist all testified that the gun was not only pointed at the victim, but was very near to or right against the victim's head.[2] There is simply nothing in the record to contradict this evidence.

---

2. The deputy coroner testified that "[t]he gunshot wound appeared to be a contact or very near a contact type wound." The crime scene investigator also testified that upon observation of the body he believed

To warrant a charge of involuntary manslaughter or accident, a homicide cannot have occurred during the commission of a felony.[3] In South Carolina, it is a felony "for a person to present or point at another person a loaded or unloaded firearm." S.C.Code Ann. § 16–23–410 (1976). Thus, whether or not Reese intended to shoot his wife, he would not be entitled to an involuntary manslaughter or accident charge because the only evidence in the record is that the shooting occurred while he was committing the felony of "presenting or pointing" a firearm. *See State v. Tucker,* 324 S.C. 155, 170, 478 S.E.2d 260, 268 (1996), *cert. denied,* 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 708 (1997) (defining involuntary manslaughter, in relevant part, as the killing of another without malice and unintentionally, but while one is engaged in the commission of some unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm); *State v. Young,* 319 S.C. 33, 39–40, 459 S.E.2d 84, 87–88 (1995) (finding the defendant was not entitled to a charge of involuntary manslaughter despite his statement that the gun "just went off" because his statement also indicated he was committing the felony of armed robbery at the time of the shooting).

The majority correctly notes that the negligent handling of a firearm supports a charge for involuntary manslaughter; however, where the mishandling of a weapon coincides with

the victim's death was caused by a either "soft contact or a close contact type wound." Likewise, the forensic pathologist, who performed an autopsy on the body, testified that there was a "loose contact gunshot wound to the left side of the head." The pathologist further explained that "[t]he gun was just brushing the skin."

3. South Carolina courts have defined involuntary manslaughter as either (1) the killing of another without malice and unintentionally, but while one is engaged in the commission of some unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm; or (2) the killing of another without malice and unintentionally but while engaged in the doing of a lawful act with a reckless disregard of the safety of others. *State v. Tucker,* 324 S.C. 155, 170, 478 S.E.2d 260, 268 (1996), *cert. denied,* 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 708 (1997). For a homicide to be deemed an accident, there must be evidence that the killing was unintentional, the defendant was acting lawfully, and due care was exercised in the handling of the weapon. *State v. Goodson,* 312 S.C. 278, 280, 440 S.E.2d 370, 372 (1994).

the commission of a felony or some other unlawful act that naturally tends to cause death or great bodily harm, an involuntary manslaughter charge is not warranted. In *State v. Burriss*, 334 S.C. 256, 264–65, 513 S.E.2d 104, 109 (1999), our supreme court found that evidence on the record could support a finding that appellant was entitled to arm himself in self-defense and was therefore acting lawfully when his negligent handling of a loaded weapon caused the weapon to fire and kill the victim.[4] Likewise, in *State v. Crosby*, 355 S.C. 47, 50, 584 S.E.2d 110, 111 (2003), the supreme court held that involuntary manslaughter should have been instructed because there was evidence that the victim was charging the appellant with his hand behind his back, and the appellant closed his eyes and fired the gun, without even realizing he had pulled the trigger. In both of these cases, the appellants were entitled to a charge of involuntary manslaughter because there was evidence from which the jury could infer they were *lawfully* acting in self-defense when they unintentionally fired a gun.[5]

---

4. The majority also cites to *State v. White*, 253 S.C. 475, 478, 171 S.E.2d 712, 714 (1969), for the proposition that the negligent handling of a loaded gun supports a finding for involuntary manslaughter. Although *White* does cite that proposition of law, the opinion does not discuss whether the defendant was entitled to an involuntary manslaughter charge based on the negligent mishandling of a loaded gun. The issue in *White* was whether the trial judge erred in allowing an indictment for murder to go to the jury when the only charge submitted to the jury was involuntary manslaughter.

5. The only other cases in which our appellate courts have found that a defendant's negligent handling of a loaded firearm supported a charge for involuntary manslaughter are *State v. Causer*, 87 S.C. 516, 517, 70 S.E. 161, 161 (1911) (defendant took a hunting rifle away from decedent, who had been pointing the gun at two little boys, and defendant was walking away with the gun when, "in some unexplained way it went off, killing the [decedent], who had walked up behind"); *State v. Tucker*, 86 S.C. 211, 212, 68 S.E. 523, 524 (1910) (defendant was "rubbing [a] pistol" while sitting next to his half-brother, and "without knowing that [the pistol] was loaded or that his brother was in front of him, [defendant] pulled the trigger without meaning to do so"); *State v. Revels*, 86 S.C. 213, 214–215, 68 S.E. 523, 523 (1910) (a decedent grabbed and pulled on the defendant's cocked gun when it fired, fatally shooting decedent in the knee); *State v. Gilliam*, 66 S.C. 419, 421, 45 S.E. 6, 7 (1903) (defendant and his decedent wife were "in a playful tussle" for the possession of a pistol when the gun unintentionally fired). Notably, all of these cases differ from the case at hand because

In the case at hand, Reese was not acting in self-defense. Rather, by his own admission, he was brandishing a gun in order to see how his wife would react if he threatened to shoot himself. While he had the gun in the air, he moved it back and forth, and according to all the evidence in the record, when it was very close to his wife's head, he shot her. Even if Reese did not intend to shoot his wife, he is not entitled to an involuntary manslaughter charge because, at the time of the shooting, he was pointing or presenting a weapon, which is a felony, and he was attempting suicide, an unlawful act naturally tending to cause death or great bodily harm. *See State v. Levelle,* 34 S.C. 120, 13 S.E. 319 (1891) (stating that suicide is an unlawful act and that if A takes B's life when attempting suicide, A is guilty of murder) *overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991). Accordingly, I would affirm the trial judge's ruling denying Reese's request to charge the jury on involuntary manslaughter and accident.

## II. Closing Argument

In regards to the solicitor's closing argument, which urged the jury to "speak for the victim," I agree with the majority's finding that this type of argument impermissibly asks the jurors to advocate for the victim. However, I find the judge's error in allowing the argument was harmless in light of the overwhelming evidence of Reese's guilt. *See State v. Mitchell,* 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985) (stating that an error is harmless when it could not reasonably have affected the result of the trial); *see, e.g., State v. Primus,* 349 S.C. 576, 577–578, 564 S.E.2d 103, 109 (2002) (applying harmless error analysis to improper comment by prosecutor during closing argument as to defendant's failure to call a witness).

In Reese's statement to police, he claimed he pulled out a gun and told the victim he was going to kill himself. He admitted that he was waving the gun back and forth and that the gun went off, though he denied purposefully killing her. Numerous witnesses testified that the victim died as a result of a single gunshot wound. Those witnesses also testified that

---

the negligent mishandling of the weapon coincided with lawful activities.

the gun was either very near or right against the victim's head. Based on this overwhelming evidence of Reese's guilt, especially the uncontradicted evidence that he shot the victim in the head while feloniously presenting a firearm, I firmly believe the solicitor's improper comments during closing argument were harmless beyond a reasonable doubt.

### III. Purported Hearsay Regarding Marital Problems

Because I propose to affirm Reese's convictions, I briefly address his other arguments on appeal. Reese contends the trial judge erred in allowing witnesses to testify that the victim had moved to her mother's home because of marital problems. Reese asserts such testimony was hearsay.

The victim's cousin testified without objection that "a week or two" before the victim was killed, she and Reese separated and she had moved back in with her parents. Because no objection was made to this testimony, subsequent testimony wherein witnesses stated that Reese and the victim had marital problems, without giving any details, was cumulative to the cousin's testimony, which was admitted without objection. Therefore, even assuming *arguendo* that the other witnesses' testimony was impermissible hearsay, any error in admitting their testimony was harmless. *See State v. South,* 285 S.C. 529, 535, 331 S.E.2d 775, 778 (1985) (finding that although the court erred by admitting officer's notes into evidence, the "error was harmless beyond a reasonable doubt since [notes were] cumulative to the abundant amount of similar evidence admitted at trial").

### IV. State of Mind Hearsay Exception

Reese also argues the trial judge erred in allowing witnesses to testify that the victim was "afraid for her life" because such testimony did not meet the state of mind exception to the rule against hearsay. Our supreme court addressed the scope of the state of mind exception in *State v. Garcia,* 334 S.C. 71, 76, 512 S.E.2d 507, 509 (1999), and found that "while the present state of the declarant's mind is admissible as an exception to hearsay, the reason for the declarant's state of mind is not." Reese contends that the witnesses's testimony that the victim was afraid for her life impermissibly

related to the reason for the victim's state of mind. I disagree.

In *Garcia*, the witnesses repeated out-of-court statements that the defendant had kicked and threatened to kill the decedent and because of that, the decedent had been afraid. Here, the witnesses merely testified that Reese's wife feared for her life, which described the type of fear she experienced rather than the cause for such fear. As such, the trial judge correctly admitted the testimony under Rule 803(3), SCRE.

## V. Admissibility of Photographs

Finally, Reese argues the trial judge erred by allowing the State to admit photographs of the victim's body into evidence because the photographs were more prejudicial than probative. Generally, a trial judge's decision to admit evidence will not be reversed on appeal absent an abuse of discretion. *State v. Adams*, 354 S.C. 361, 377, 580 S.E.2d 785, 793 (Ct.App.2003). Because Reese failed to provide this court with a copy of those photographs, I would not meet the merits of this issue. *See Harkins v. Greenville County*, 340 S.C. 606, 616, 533 S.E.2d 886, 891 (2000) (explaining that the appellant has the burden of presenting the appellate court with an adequate record).

## CONCLUSION

I respectfully disagree with the majority's holding that Reese was entitled to a charge on involuntary manslaughter. Further, although I agree that the solicitor's closing argument was improper, I believe the error was harmless in light of the overwhelming evidence of Reese's guilt. All of Reese's other arguments on appeal are without merit. Therefore, I would affirm Reese's conviction for murder.