707 S.E.2d 265

**The STATE, Respondent,**

v.

**Robert A. BOSWELL, Appellant.**

**No. 26941.**

Supreme Court of South Carolina.

Heard Jan. 19, 2011.

Decided March 14, 2011.

Rehearing Denied April 8, 2011.

David I. Bruck, of Columbia, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott and Assistant Attorney General William M.

Blitch, Jr., of Columbia, and Solicitor Donald V. Myers, of Lexington, for Respondent.

Justice BEATTY.

After a jury convicted Robert Boswell of first-degree burglary, the circuit court sentenced him to life imprisonment without the possibility of parole (LWOP).[1] Following the denial of his motions for a new trial and reconsideration of his sentence, Boswell appealed his conviction and sentence on the grounds the circuit court erred in: (1) declining to suppress his confessions as they were the direct result of an unlawful arrest by officers acting outside their territorial jurisdiction; and (2) imposing an LWOP sentence as it constituted an abuse of discretion and violated state and federal protections against cruel and unusual punishment. Because we find the arrest of Boswell was unlawful, we reverse and remand.

## I. Factual/Procedural Background

At approximately 6:15 p.m. on August 10, 2001, Amy Westbury left her Lexington County home to go to work. When she returned home the next morning around 11:00 a.m., Westbury discovered that someone had broken into her home through a bedroom window. Westbury's review of the home revealed that only items belonging to her and not her husband had been taken. Specifically, Westbury noticed the following items were missing: several dresses, a sequined gown, a taffeta gown, several pairs of shoes, workout leotards, undergarments, a couple of children's dresses, a bottle of perfume, makeup, jewelry, and a pillowcase from the master bedroom.

Shortly after discovering the break-in, the Westburys contacted the Lexington County Sheriff's Department. During the course of the investigation, Captain Joe Quig followed up on "a lead out of Calhoun County." According to Captain

---

1. *See* S.C.Code Ann. § 16–11–311(A)(3) (2003) ("A person is guilty of burglary in the first degree if the person enters a dwelling without consent and with intent to commit a crime in the dwelling, and … the entering or remaining occurs in the nighttime."); S.C.Code Ann. § 16–11–311(B) (2003) ("Burglary in the first degree is a felony punishable by life imprisonment. For purposes of this section, 'life' means until death. The court, in its discretion, may sentence the defendant to a term of not less than fifteen years.").

Quig, he received information that some of the stolen items may have been deposited in an abandoned house located off "a frontage road on I–26 right inside of Calhoun County, right outside of Lexington County."

On August 24, 2001, Captain Quig decided to investigate the abandoned house. Prior to entering Calhoun County, Quig contacted the Calhoun County Sheriff's Department and spoke with Sheriff Summers regarding the alleged stolen property. According to Quig, "the Sheriff said help myself, go ahead and take a look at the house; and that if I found anything that didn't belong to us, he wanted me to catalog it and turn it into the Calhoun County Sheriff's Department for processing for possibly being a stolen item out of their area or their jurisdiction."

When Captain Quig and other Lexington County officers investigated the outside of the house and looked through the windows, they saw "female clothes" and "pornographic magazines on the floor and things like that." Because he believed some of the items may have belonged to Amy Westbury, Captain Quig procured a search warrant for the house.

As a result of their discovery, Captain Quig and other Lexington County officers, including Lieutenant Henry Dukes, set up surveillance of the abandoned house on August 24 and 25, 2001. Captain Quig claimed he had "cleared" the surveillance operation with Sheriff Summers. Quig testified that "[t]heir edict to us was 'Fine, have at it. We can't help you with it. If you find anything or anything comes up, call us.' "

On the second night of the surveillance operation, Lieutenant Dukes made radio contact with the Calhoun County Sheriff's Department. In response to the call, Sheriff Summers and several of his deputies came to the surveillance location. Lieutenant Dukes then discussed the operation with Sheriff Summers and requested that a Calhoun County officer remain at the location. According to Lieutenant Dukes, Sheriff Summers stated, "It looks like you are doing a fine job. You have got everything under control as far as I'm concerned." Sheriff Summers also did not believe it was necessary for a Calhoun County officer to remain with Lieutenant Dukes but assured him that he would return if assistance was needed.

At approximately 10:30 p.m. on August 25, 2001, a man drove up to the abandoned house. Lieutenant Dukes observed the man, who was later identified as Boswell, stop the vehicle and turn off all the lights except for the interior light. As Lieutenant Dukes approached the vehicle, he saw Boswell "bringing different items out of the vehicle and chunking them into the woods." When he turned his flashlight on Boswell, Lieutenant Dukes observed Boswell "with his pants down around his ankles. He had something in his hand wrapped around his penis, and he was masturbating as he was throwing things out of the vehicle into the hedgerow and also onto the ground." After Lieutenant Dukes identified himself, he directed Boswell to stop what he was doing and put his hands where the officer could see them. Boswell ignored the command and continued to reach into the vehicle and throw out items, including a knife and a crowbar. As a result, the officers threw Boswell to the ground, handcuffed him, and placed him in investigative detention. Lieutenant Dukes then ascertained Boswell's identity, read him his *Miranda*[2] rights, and placed him in a Lexington County patrol car to await the arrival of Captain Quig. Lieutenant Dukes explained that Boswell was detained for "[b]eing at the location nude, masturbating, also throwing weapons, and not following law enforcement that was fully identified."

Shortly thereafter, Lieutenant Dukes contacted Sheriff Summers and Captain Quig. When Captain Quig arrived, he spoke to the Lexington County officers as well as Sheriff Summers and two Calhoun County deputies.

The officers' subsequent search of Boswell's vehicle revealed what one officer described as burglary tools, which included a pair of gloves, a hammer, a screwdriver, and a flashlight. The vehicle also contained "gym bags" that had "various clothing items."

After speaking with Sheriff Summers, Captain Quig "determined that we had more [than] probable cause to arrest [Boswell] with the burglary tools and the things that were in that field that he had thrown out on the ground." He then transported Boswell to the Lexington County Sheriff's Department.

---

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

On August 26, 2001, Boswell gave a recorded statement in which he confessed to the burglary. On August 28, 2001, Captain Quig had Boswell review the transcribed statement and check it for accuracy. That same day, Boswell agreed to give another statement. This statement, however, was given while Boswell rode with Captain Quig in a patrol vehicle. According to the text of the statement, Boswell directed Captain Quig to drive to the Westburys' home. When they arrived, Boswell again confessed to burglarizing the Westburys' home.

Subsequently, a Lexington County grand jury indicted Boswell for first-degree burglary on the ground that the entry into the Westbury home occurred in the nighttime.

Prior to trial and throughout the trial, Boswell's counsel sought to suppress Boswell's confessions to Captain Quig on the ground that they were the products of an unlawful arrest made without legal authority by Lexington County law enforcement officers acting outside their territorial jurisdiction. In response, the State offered evidence of a 1999 "multi-jurisdictional agreement" entered into between the Calhoun County and Lexington County Sheriffs' Departments that purported to confer the authority of officers to arrest in the other county's jurisdiction.

In a pre-trial ruling, the trial judge denied Boswell's counsel's motion. Specifically, he found that "the Lexington County deputies did act consistently with the standard required by the statute." Throughout the trial, the judge reiterated this ruling each time Boswell's counsel interjected an objection.

Following the denial of its motion for a directed verdict, the defense presented Boswell as its sole witness. Although Boswell admitted to committing the burglary, he testified it occurred during the daytime and not the nighttime as stated in his confessions. In explaining this discrepancy, Boswell testified that he was "confused" because he was not taking his medication for bipolar disorder and he was "coming off" the Valium that he had taken prior to his arrest. Boswell also believed he committed the burglary because he was not taking his medication for bipolar disorder. He claimed he had not taken the medication for approximately one year before the August 2001 burglary.

Ultimately, the jury convicted Boswell of first-degree burglary. The trial judge sentenced Boswell to life imprisonment without the possibility of parole. In a post-trial motion, Boswell's counsel moved for a new trial on the ground that Boswell's arrest was unlawful and any evidence obtained as the result of the arrest was inadmissible. Additionally, counsel requested the trial judge reconsider the life sentence.

By order dated May 12, 2008, Circuit Court Judge James Johnson[3] denied Boswell's motions for a new trial and reconsideration of his sentence. Subsequently, Boswell appealed his conviction and sentence to the Court of Appeals. This Court certified the appeal pursuant to Rule 204(b), SCACR.

## II. Discussion

### A.

Boswell contends the trial judge erred in declining to suppress his confessions to Captain Quig as they were the product of an unlawful arrest by the Lexington County officers acting outside their territorial jurisdiction. In support of this contention, Boswell asserts that neither the 1999 multi-jurisdictional agreement nor any provision of South Carolina law authorized the Lexington County deputies to arrest him in Calhoun County. Because his arrest was unlawful, Boswell argues that his confessions were inadmissible as they were the "fruit of the poisonous tree."[4]

### B.

As a threshold matter, the State claims that Boswell failed to properly preserve this issue for appellate review. We disagree.

---

3. Due to a number of delays, the trial judge (Circuit Court Judge Marc H. Westbrook) was unable to hear the motion prior to his untimely death. On March 14, 2008, approximately 4.5 years after the trial, Circuit Court Judge James W. Johnson held a hearing on the motion.

4. See State v. Copeland, 321 S.C. 318, 323, 468 S.E.2d 620, 624 (1996) ("The 'fruit of the poisonous tree' doctrine provides that evidence must be excluded if it would not have come to light but for the illegal actions of the police, and the evidence has been obtained by exploitation of that illegality.") (citing Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

Based on our review of the record, Boswell's counsel clearly argued that Boswell's statements should have been suppressed as they were the product of Lexington County officers acting outside their territorial jurisdiction. Because counsel and the judge simply used the term "jurisdiction," the judge at times seemed to interpret this term as "subject matter jurisdiction." Given that territorial jurisdiction and subject matter jurisdiction are separate and distinct concepts, there was some confusion amongst counsel and the judge as to the use of the term "jurisdiction." *See Smith v. Commonwealth,* 56 Va.App. 351, 693 S.E.2d 765, 769 (2010) (parsing the term "jurisdiction" and recognizing that subject matter jurisdiction is the authority granted through the constitution or statute to adjudicate a class of cases or controversies and that territorial jurisdiction is the authority over persons, things or occurrences located in a defined geographical area); *see also State v. Dudley,* 364 S.C. 578, 614 S.E.2d 623 (2005) (recognizing that the State's extra-territorial jurisdiction is not a component of subject matter jurisdiction).

Despite the specific terminology error, the judge understood that Boswell's counsel was moving to suppress the confessions as the fruit of an unlawful arrest.[5] Moreover, in denying this motion, the judge stated that "the Lexington County deputies did act consistently with the standard required by the statute and [I] deny the motion to dismiss on lack of jurisdiction." As we interpret this ruling, the judge clearly considered and ruled on the territorial arrest powers of the Lexington County deputies in Calhoun County. Additionally, Boswell's counsel repeatedly raised this argument and interjected an objection to the admission of Boswell's statements throughout the trial.

Finally, we reject any assertion that Boswell's confessions were cumulative to Boswell's trial testimony. Because the judge had ruled against the defense motion, counsel called Boswell as a witness to explain these confessions. Thus, Boswell should not now be precluded from raising this properly preserved issue on appeal.

---

5. Notably, counsel argued that "any evidence seized in connection with the arrest, to include any statements made by the Defendant as a result of the arrest, would be unlawful and the fruit of the poisonous tree. We accordingly ask for a ruling on that point."

## C.

■ Finding the issue preserved, the question becomes whether the Lexington County officers were authorized to arrest Boswell in Calhoun County.

As an initial matter, it is undisputed that the Lexington County officers were not "in pursuit" of Boswell from Lexington County into Calhoun County; thus, section 17–13–40 of the South Carolina Code is not relevant to our determination of this issue. *See* S.C.Code Ann. § 17–13–40(B) (2003) ("When the police authorities of a county are in pursuit of an offender for a violation of a county ordinance or statute of this State committed within the county, the authorities may arrest the offender, with or without a warrant, at a place within the county, or at a place within an adjacent county."). Furthermore, there is no substantiated evidence that the Lexington County officers had a warrant for Boswell's arrest.[6]

Therefore, the only two grounds by which the Lexington County officers could have been authorized to arrest Boswell in Calhoun County are the 1999 multi-jurisdictional agreement or via a private citizen's arrest. In order for the 1999 agreement to confer arrest authority, we must find that the agreement was valid and that its terms covered the factual scenario presented in the instant case. Alternatively, if we find that the 1999 agreement did not authorize the arrest, we must determine whether the Lexington County officers effectuated a proper citizen's arrest.

On April 16, 1999, Lexington County Sheriff James Metts and Calhoun County Sheriff Dennis Jones signed a written agreement "for the purpose of securing to each other the benefits of mutual aid in the event of natural disaster, disorder, or other emergency situations...." The terms of the agreement incorporate the text of sections 23–1–210 and 17–13–45 of the South Carolina Code, which govern agreements involving the temporary transfer of law enforcement officers.[7]

---

6. During the pre-trial hearing, Captain Quig stated "the initial arrest on [Boswell] was subsequent to a bench warrant that had been issued in 2000 for traffic violations, with the other things to be investigated, and warrants to follow in the morning for the burglary."

7. At the time the counties entered into the agreement, section 23–1–210 provided:

In 2000, the Legislature promulgated section 23–20–50 to require County approval of multi-jurisdictional agreements. This section states:

(A) An agreement entered into pursuant to this chapter on behalf of a law enforcement authority must be approved by the appropriate state, county, or local law enforcement authority's chief executive officer. A state law enforcement authority must provide a copy of the agreement to the Governor and the Executive Director of the State Budget and Control Board no later than one business day after executing the agreement. An agreement entered into with a local law enforcement authority pursuant to this chapter must be approved by the governing body of each jurisdiction. *For agreements entered into prior to June 1, 2000, the agreement may be ratified by the governing body of each jurisdiction.*

---

(A) Any municipal or county law enforcement officer may be transferred on a temporary basis to work in law enforcement in any other municipality or county in this State under the conditions set forth in this section, and when so transferred shall have all powers and authority of a law enforcement officer employed by the jurisdiction to which he is transferred.

(B) Prior to any transfer as authorized in subsection (A), the concerned municipalities or counties shall enter into written agreements stating the conditions and terms of the temporary employment of officers to be transferred. The bond for any officer transferred shall include coverage for his activity in the municipality or county to which he is transferred in the same manner and to the same extent provided by bonds of regularly employed officers of that municipality or county.

S.C.Code Ann. § 23–1–210(A), (B) (2007). In 2007, this code section was amended to expand the authority of multi-jurisdictional task forces. Act No. 3, 2007 S.C. Acts 4; *see also* S.C.Code Ann. § 23–1–210 (Supp.2010). This amendment, however, does not affect the disposition of the instant case.

Additionally, section 17–13–45 provided:

When a law enforcement officer responds to a distress call or a request for assistance in an adjacent jurisdiction, the authority, rights, privileges, and immunities, including coverage under the workers' compensation laws, and tort liability coverage obtained pursuant to the provisions of Chapter 78, Title 15, that are applicable to an officer within the jurisdiction in which he is employed are extended to and include the adjacent jurisdiction.

S.C.Code Ann. § 17–13–45 (2003).

(B) The officers of the law enforcement provider have the same legal rights, powers, and duties to enforce the laws of South Carolina as the law enforcement agency contracting for the services.

S.C.Code Ann. § 23–20–50(A), (B) (2007) (emphasis added).

Given this statute was in effect at the time of Boswell's arrest, we must assess the validity of the 1999 agreement. The last sentence of subsection A states that "the agreement may be ratified by the governing bodies of each jurisdiction." The State construes the phrase "may be ratified" to mean that the governing bodies of Calhoun and Lexington counties did not have to formally approve the 1999 agreement after the 2000 amendment. We disagree.

In contrast to the State's interpretation, we construe subsection A as requiring governing bodies to formally approve a pre-existing agreement if it is to retain its validity.[8] Taking into account the significance of territorial jurisdiction, we believe a more stringent approach needs to be followed in order to confer this type of authority.

In the instant case, the General Counsel for the Lexington County Sheriff's Department admitted that the 1999 agreement had been "sent to" but not voted on by the county council. Based on the failure to satisfy the requisite statutory provisions, we find the 1999 agreement was invalid. Thus, it could not have operated to authorize the Lexington County officers to arrest Boswell in Calhoun County. *Cf. Commonwealth v. Novick*, 293 Pa.Super. 241, 438 A.2d 974 (1981), *appeal dismissed as improvidently granted*, 500 Pa. 546, 458 A.2d 1350 (1983) (concluding that, absent a proven joint municipal contract for police protection between the jurisdictions involved, an extra-jurisdictional arrest for burglary by local police officer without a warrant was invalid, even though made on "probable cause" to suspect the arrestee of burglary; reversing trial court's decision refusing to suppress an overwhelming quantity of evidence resulting from oral and written

---

8. *See Black's Law Dictionary* 1268–69 (7th ed.1999) (defining "ratification" as "[c]onfirmation and acceptance of a previous act, thereby making the act valid from the moment it was done"); *cf. id.* at 98 (defining "approve" as "[t]o give formal sanction to; confirm authoritatively").

inculpatory statements by the arrestee following the arrest in question).

Even assuming the 1999 agreement was valid, the terms of the agreement did not cover the actions of the Lexington County officers as the employment of officers from the adjacent jurisdiction was to occur only in the event of emergency situations or when one jurisdiction specifically requested the assistance of officers from the adjacent jurisdiction.[9] Moreover, the agreement clearly intended for the Lexington County and Calhoun County officers to work simultaneously.

None of the above-outlined requirements were present in the instant case. Here, Lexington County officers "cleared" their surveillance operation with the Sheriff of Calhoun County. Although Sheriff Summers and several officers were present at the beginning of the surveillance operation, Sheriff Summers did not feel that it was necessary for his county officers to remain at the surveillance site. Furthermore, no Calhoun County officers were present at the time of Boswell's arrest. In view of the specific facts of instant case, we conclude the 1999 agreement did not authorize the Lexington County officers to arrest Boswell in Calhoun County.

■ In view of our finding that the 1999 agreement did not authorize the Lexington County officers to arrest Boswell outside of their territorial jurisdiction, the question becomes whether the officers acting as "private citizens" could have effectuated the arrest.

The key case in this determination is *State v. McAteer*, 340 S.C. 644, 532 S.E.2d 865 (2000). In *McAteer*, an off-duty (but

---

9. Paragraph 4 A of the agreement provides:

> A request for assistance shall only be made by the senior duty officer of the law enforcement agency requiring such assistance. The request shall include a description of the situation creating the need for assistance, the number of law enforcement officers requested, the location to which personnel are to be dispatched, and the officer in charge at such location.

Furthermore, the Legislature intended for these multi-jurisdictional agreements to be in place for the purpose of emergency situations. *See* S.C.Code Ann. § 23–20–30 (2007) (recognizing need for the agreements for public safety functions, which include "traditional public safety activities which are performed over a specified time period for patrol services, crowd control and traffic control, and other emergency service situations").

still uniformed) municipal officer observed McAteer drive his automobile approximately 250 yards on a dirt road outside the municipality's city limits. The officer approached the car, and McAteer rolled down the window. *Id.* at 646, 532 S.E.2d at 865. The officer smelled alcohol and observed open alcoholic beverage containers in the car, and detained McAteer until a Highway patrolman arrived. *Id.* The patrolman administered several field sobriety tests to McAteer, then formally arrested him and transported him to the York County Detention Center where McAteer blew a .18 on the breathalyzer. *Id.*

Because the officer was outside the municipality's city limits when he first observed McAteer, this Court found that he had no police authority to detain McAteer. *Id.* at 646, 532 S.E.2d at 866. We, however, considered the question of whether the officer was authorized to arrest McAteer as a private citizen. *Id.* After conducting a thorough survey of statutory and common law, this Court ultimately held that "there is no common law right to make warrantless citizen's arrests of any kind and that such rights as exist are created by statute in South Carolina." *Id.* at 650, 532 S.E.2d at 868.

Our decision in *McAteer* clearly limited a citizen's power to arrest only in those instances involving a felony. *McAteer*, 340 S.C. at 646–47, 532 S.E.2d at 866 (citing section 17–13–10, which provides that a citizen may arrest upon view of felony committed, and finding inapplicable section 17–13–20, which permits other warrantless citizen's arrests for events occurring in the nighttime given McAteer's arrest occurred in the daytime and involved a misdemeanor and not a felony).

Here, Boswell's actions may have supported an arrest for indecent exposure; however, this offense is a misdemeanor.[10] Because the Lexington County officers did not witness Boswell commit a felony, they could not have effectuated a citizen's arrest of Boswell under *McAteer*.

---

**10.** *See* S.C.Code Ann. § 16–15–130(A)(1), (B) (Supp.2010) (providing that "[i]t is unlawful for a person to wilfully, maliciously, and indecently expose his person in a public place, on property of others, or to the view of any person on a street or highway;" classifying the crime of indecent exposure as a misdemeanor).

Thus, the question becomes whether there is any other ground to support a citizen's arrest. The only conceivable avenue would be pursuant to section 17–13–20(d) of the South Carolina Code, which provides for a citizen's arrest if the citizen witnesses another disposing of stolen items in the nighttime. *See* S.C.Code Ann. 17–13–20(d) (2003) ("A citizen may arrest a person in the nighttime by efficient means as the darkness and the probability of escape render necessary, even if the life of the person should be taken, when the person ... has in his possession stolen property.").

We find the facts do not support a citizen's arrest under section 17–13–20(d). When Boswell arrived at the abandoned house, Lieutenant Dukes observed him throw several items out of the vehicle, including a crowbar and a knife. Although these items could have been legitimately construed as burglary tools, it would have been purely speculative for Lieutenant Dukes to identify these items as stolen. Lieutenant Dukes essentially admitted this fact when he conceded that he had no way of knowing whether any of the items came from Lexington County. Based on his observations, he could only discern that the items "were consistent with items that we were looking for from the burglary that happened in Lexington County."

Based on the foregoing, we conclude Boswell's arrest was unlawful as there was no specific statutory authorization or valid agreement between Lexington County and Calhoun County to authorize the warrantless arrest. See Russell G. Donaldson, Annotation, *Validity, In State Criminal Trial, of Arrest Without Warrant By Identified Peace Officers Outside of Jurisdiction, When Not in Fresh Pursuit,* 34 A.L.R.4th 328, § 4 at 337 (1984 & Supp.2011) ("There is authority to the effect that, absent specific statutory authorization such as a 'fresh pursuit' law, or valid agreements between adjoining or neighboring governmental entities creating specific authority for extrajurisdictional, warrantless arrests by police officers, there can be no validity in such an arrest, the assertion of purported official authority therein negating any theory that the arresting officer or officers could have been acting as 'private citizens' at the time.").[11]

---

11. Even if the arrest was unlawful, the State claims it was "remedied" by the officers' "good faith" reliance on the 1999 agreement, the

## III. Conclusion

In conclusion, we hold the Lexington County officers were not authorized to arrest Boswell in Calhoun County as the 1999 agreement did not confer this power and there is no South Carolina statute that would support a citizen's arrest. Accordingly, we find trial judge erred in refusing to suppress Boswell's confessions as the product of the unlawful arrest.[12]

**REVERSED AND REMANDED.[13]**

TOAL, C.J., PLEICONES, KITTREDGE and HEARN, JJ., concur.

---

permission granted by the Calhoun County Sheriff, the presence of the Calhoun County Sheriff, and the subsequent determination that Boswell had an outstanding warrant for his arrest. We find that none of the reasons posited by the State can "remedy" the unlawful arrest.

12. In view of our ruling that Boswell's arrest was unlawful and that his confessions should not have been admitted, we decline to consider Boswell's arguments regarding his sentence of life imprisonment without the possibility of parole. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating an appellate court need not address remaining issues when a decision on a prior issue is dispositive).

13. In no way should our decision be construed as minimizing Boswell's disturbing conduct for which he has been incarcerated since 2001. We cannot, however, ignore or capriciously disregard a jurisdictional defect in order to reach a more desirable result.